No. 46,416

*In re* Estate of Celia Dreiling Billinger, a/k/a Cecelia Dreiling Billinger (KENNETH F. WOLF and DOROTHY J. WOLF, *Appellees,* v. G. J. DENNING, Executor, *Appellant.*)

(491 P. 2d 924)

Opinion filed December 11, 1971.

*Stan E. Wisdom,* of Jochems, Sargent and Blaes, of Wichita, argued the cause, and *William Wagner,* of Deines and Wagner, of WaKeeney, was with him on the brief for the appellant.

*Norbert R. Dreiling,* of Dreiling and Bieker, of Hays, argued the cause, and *Dennis L. Bieker* of the same firm was with him on the brief for the appellees.

The opinion of the court was delivered by

HARMAN, C.: This is an action by claimants Kenneth F. Wolf and Dorothy J. Wolf, his wife, against the estate of Celia Dreiling Billinger, deceased, for specific performance of an oral contract between claimants and the decedent whereby she was to devise and bequeath her entire estate to them, except for one quarter section of land and a $5,000 bequest to the local Catholic church. The trial court ordered specific performance of the alleged contract and the executor of the decedent's estate has appealed.

Trial was to the court. The story developed therein may best be told initially by quoting the findings and rulings entered by the court as follows:

"No. 1

"The written stipulations signed by counsel and filed March 6, 1970, are made part of the findings of the Court. These stipulations set out the description and popular name of each piece of farm real estate owned by the decedent, Celia Dreiling Billinger, at the time of her death, April 18, 1968.

"No. 2

"In these findings and in the trial the claimants, Kenneth and Dorothy Wolf, husband and wife, are referred to as plaintiffs, and the executor and all respondents are referred to as defendants.

"The Court also accepts as part of the evidence the record of the decedent's estate herein in the Probate Court of Ellis County, Kansas.

"No. 3

"Dorothy Wolf, a plaintiff, is the daughter and only child of John P. Dreiling and Celia Dreiling Billinger, both deceased, having been legally adopted as an infant of about three months of age at the time of the adoption.

"It is stipulated the King half section title had been in the name of John P. Dreiling before his death, August 9, 1964. Celia died April 18, 1968.

"No. 4

"The Court finds from a preponderance of clear and convincing evidence that in about late August, 1962, John P. Dreiling and Celia Dreiling made the following oral offer to Kenneth and Dorothy Wolf, the plaintiffs: that if Kenneth and Dorothy Wolf would come back to the farm and their employ, they, John P. and Celia Dreiling, would pay $200.00 per month and would convey the King farm to them. The Wolfs said they would think it over and returned to Hutchinson where Kenneth was working as a mechanic. This is the testimony of Kenneth and Dorothy concerning a conversation at the Dreiling residence in which Celia and John P. Dreiling and Kenneth and Dorothy Wolf were present.

"About mid-September, 1962, in response to a phone call, Kenneth and Dorothy Wolf returned to Hays where at the Dreiling residence Celia, in the absence of John P. Dreiling, repeated this offer and added the further offer that she would also within a year if she lived, convey the 'Daisy' farm she owned in Graham County to the Wolfs, and if she did not live, she would leave the Daisy farm to the Wolfs. This is the testimony of both Kenneth and Dorothy Wolf. These offers were accepted by Kenneth and Dorothy and they immediately returned to Hutchinson to load their belongings and moved to Ellis County into the house on the Disney farm and became subservient to every request of Celia and John P. Dreiling.

"No. 5

"As corroboration for the foregoing, the Court finds from a preponderance of clear and convincing evidence as follows:

"These offers and acceptance were made at a time when Celia and John P. Dreiling were preparing to go to the Mayo Clinic in Rochester, Minnesota, she for hospitalization and he for physical checkup. And they had experienced difficulty keeping hired help. Under circumstances of past experiences of Kenneth and Dorothy Wolf in two previous periods in the employ of Celia and John P. Dreiling, it would be unreasonable and unlikely they would return to those conditions and employment for merely $200.00 per month.

"The evidence shows Celia was tight with money and property and demanding, domineering, and suspicious toward hired help including her daughter and son-in-law, Dorothy and Kenneth Wolf. In a suspicious manner, Celia followed the practice of seeking to retain control in herself in minute detail so that working for her became an ordeal.

"Shortly before this, according to the testimony of Mrs. Martha Schlachter, Celia told her of her difficulties with hired help, and that she, (Celia) would do anything to get Kenneth and Dorothy Wolf back.

"George Amrein, a neighboring farmer, testified that in the fall of 1963 on the occasion of helping Kenneth Wolf and John P. Dreiling butcher a hog, John told him, 'The kids (Kenneth and Dorothy Wolf) have treated him so good he was going to have to give them something . . . and I remember he mentioned the King place.'

"Attorney Thomas C. Boone testified that in the spring of 1964, John P. Dreiling while in Boone's office, 'lamented' that he wanted to convey the King farm to Kenneth and Dorothy Wolf but Celia would not permit it.

"The evidence is clear and convincing that Kenneth and Dorothy fully and continuously performed their part of the oral contract up until the death of John P. Dreiling, August 9, 1964, but both John P. and Celia Dreiling had failed to transfer title to the King farm owned by John or the Daisy farm owned by Celia.

"No. 6

"The Court finds from a preponderance of clear and convincing evidence that a few days after the death of John P. Dreiling, plaintiffs Kenneth and Dorothy Wolf drove Celia in a car to the office of Attorney F. F. Wasinger in Hays, and Celia obtained the last will of John P. Dreiling from Mr. Wasinger. In the car after leaving the office of Mr. Wasinger, and in the presence of Kenneth and Dorothy Wolf, Celia showed the will to Kenneth Wolf who after reading it said, 'Well, are we going to get the King place or are we going to have to make a claim against it?'" Then Celia stated that if Kenneth and Dorothy Wolf would make no claim against the estate of John P. Dreiling, deceased, and would continue to help her and work for her just as in the past and help her get all of John's property in her name, she would at her death leave all her property to them except $5,000.00 for the church and the Nick Dreiling quarter which she would return to her brother-in-law Nick Dreiling. This is the testimony of both Kenneth and Dorothy Wolf, and they accepted this offer by Celia.

"No. 7

"As corroboration of the foregoing, the Court finds from a preponderance of clear and convincing evidence as follows:

"Kenneth and Dorothy Wolf did not file a claim against the estate of John P. Dreiling, deceased, in the the Probate court of Ellis County. That estate has since been closed and their claim for the King farm against John P. Dreiling became barred by the non-claim statute. Their claim against Celia for the Daisy farm became merged in the foregoing new contract.

"Kenneth and Dorothy Wolf continued working for Celia as they had in the past. Both worked in the fields and neighbors testified to seeing Celia tending the children at times while Dorothy was operating farm equipment in the field, indicating Celia expected such field work from Dorothy. Kenneth and Dorothy met every request of Celia night and day and Sundays, far beyond what would be expected of a $200.00 per month hired hand. And were totally subservient to Celia under conditions and circumstances that no ordinary hired hand would put up with. Only a contractual promise far in excess of $200.00

per month and living quarters and bonuses shown by the evidence, makes their continuing under the conditions shown by the evidence understandable. They continued working in this manner until about the 26th day of May, 1967, when Ceila and her daughter quarreled and exchanged blows over an unfortunate dispute over which one would endorse and deposit some checks for cattle sales on behalf of Dorothy's children. Following this quarrel, Celia ordered Kenneth and Dorothy Wolf to leave and said she would rent all her land. Even after this incident, and Kenneth and Dorothy Wolf left the farm, Celia and Lewis Billinger, who she married April 24, 1967, continued to make frequent requests of Kenneth to work and Kenneth complied until January, 1968, when the requests ceased. Kenneth testified he never refused a request made by Celia. He frequently took his children to see Celia up until her death, April 18, 1968, but Celia showed no desire to see her daughter, Dorothy Wolf, after the incident about May 26, 1967.

"George Amrein, a neighbor, testified to a conversation he had with Celia at a Christmas party in 1964 at the Disney farm where Kenneth and Dorothy Wolf and family lived. Celia was in the kitchen, started crying and told Mr. Amrein the kids (Kenneth and Dorothy Wolf) had treated her so good she was going to do something, and said, 'Well, I am going to start putting some land in their name,' and then she said, 'They are going to get everything anyway.'

"Attorney Thomas C. Boone, who handled the probate of the will and administration of the estate of John P. Dreiling, deceased, testified that Celia told him at times during the administration that she desired to make a new will.

"On December 14, 1965, Celia executed her new will, a copy of which is Plaintiffs' exhibit 26, obtained from Attorney Boone's files. This will was prepared by Mr. Boone at Celia's direction. This will substantially complies with the terms of the oral agreement between Celia and Kenneth and Dorothy Wolf following the death of John P. Dreiling in August, 1964, referred to above. This will gives $5,000.00 to the church and the Nick Dreiling quarter to Nick Dreiling. Except for a $2,000.00 bequest, the rest of the estate is given part to Dorothy and part in trust for the children of Dorothy and Kenneth Wolf. Mr. Boone testified Celia in giving directions for her will, expressed distrust of the business judgment of Kenneth Wolf and said she wanted to secure property for the children, and so a trust was decided upon. This will substantially complies with the agreement in that the gifts are to the family of Kenneth and Dorothy Wolf and conforms to Celia's trait of retaining control and attaching strings. As Mr. Boone expressed it, 'she was always hedging her bets.' In view of possessive and retentive traits this is about as close as she could be expected to comply.

"Mr. Boone testified that about May 26 of 1967, on the evening of the fight between Celia and her daughter, he was called to Celia's home in Hays at which time Celia told him of the fight and said she wanted to make a new will disinheriting her daughter. Mr. Boone advised her to wait a few days. She contacted Boone a few days later with the same request and Mr. Boone again told her to wait a few days. She called on Mr. Boone frequently later on other matters up until two weeks before her death but did not again mention her

will.  Mr. Boone testified he did not learn until after her death April 18, 1968, that Plaintiffs' exhibit 26 was not a copy of her last will.

"Attorney Jack Curtis of Hays testified that on November 14, 1966, Celia brought her will, of which Plaintiffs' exhibit 26 appears to be a copy, and asked him to prepare a new will in which the only change was the designation of executor and trustee.  The new will removed Mr. Boone as executor and named Kenneth and Dorothy Wolf as executors, and removed Boone and named Gabriel Denning as trustee.  Mr. Curtis so prepared the new will and she executed it at that time.  Mr. Curtis testified he destroyed the previous will of which Plaintiffs' exhibit 26 was a copy.

"Mr. Curtis further testified that on about June 1, 1967, Celia came to his office and said, 'Dottie beat me up,' and that she wanted to change her will. Mr. Curtis prepared a new will at her direction and on June 2, 1967, Celia executed the new will in Mr. Curtis' office.  This is the last will admitted to probate herein, along with the codicil dated March 5, 1968, which Mr. Curtis also prepared for her.  This last will dated June 2, 1967, about six days after the fight between Celia and her daughter makes no mention of her daughter or her daughter's family and totally disinherits them all.

"No. 8

"The Court finds from a preponderance of clear and convincing evidence that Kenneth and Dorothy Wolf fully performed the oral contract entered into with the decedent, Celia, in August 1964 referred to above, and that the fight on or about May 26, 1967, between Celia and her only daughter, Dorothy, did not breach that contract.  The Court further finds from a preponderance of clear and convincing evidence that Celia did breach that contract when on June 2, 1967, she changed her will and executed her last will in which she disinherited her daughter and only child Dorothy Wolf, as well as her husband and grandchildren.  Celia breached the oral contract by permitting the will, dated June 2, 1967, to be her last will.

"No. 9

"All of the last will and codicil thereto, except paragraphs First, Second and Sixth of the last will dated June 2, 1967, are contrary to the terms of the contract and should be set aside.  Specific performance should be ordered, and the executor should be ordered to convey and transfer to Kenneth and Dorothy Wolf all property of the estate after payment of costs, taxes and debts and after complying with paragraphs First and Second of the last will, dated June 2, 1967.

"The oral contract of mid-August, 1964, referred to in finding No. 6 above is not void under the statute of frauds because the oral contract was capable of complete performance in less than a year in the event Celia died in less than a year, and further because the contract has since been completely performed by the plaintiffs, Kenneth and Dorothy Wolf.

"The contract is capable of specific performance by the executor, the legal representative of the decedent, Celia Dreiling Billinger, and specific performance should be ordered."

The executor-appellant urges reversal upon four grounds which will be considered in the order presented and briefed.  His principal

complaint is there was no clear and convincing evidence of the alleged oral contract. In support he relies on the following rule found in *In re Estate of Shirk,* 194 Kan. 424, 399 P. 2d 850:

"When an oral contract with a person since deceased is made the basis of an action for specific performance, it is not sufficient that the contract be established by a mere preponderance of the evidence but such evidence must be clear, cogent and convincing." (Syl. ¶ 1.)

In the same case we defined the term "clear and convincing evidence" thus:

"The term 'clear and convincing evidence' means that the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the contract must be narrated exactly and in order; the testimony must be clear, direct and weighty, and the witnesses must be lacking in confusion as to the facts at issue." (Syl. ¶ 2.)

Despite this requirement of proof beyond that necessary in the ordinary civil action, every fact need not be proved beyond a reasonable doubt. In *In re Estate of Wert,* 165 Kan. 49, 193 P. 2d 253, we find this:

"The rule relative to clear and convincing evidence being necessary to prove the definite terms of oral contracts to devise or bequeath property does not extend to the point of requiring that every provision of the agreements must be proved beyond a reasonable doubt." (Syl. ¶ 3.)

In *Jones v. Davis,* 165 Kan. 626, 197 P. 2d 932, the court held that although the evidence to establish an oral agreement to devise property must be clear and convincing, it is the trial court which is to be satisfied and convinced.

In *In re Estate of Isom,* 193 Kan. 357, 394 P. 2d 21, we commented on the character of the evidence which may be received as proof of such an oral contract, thus:

"Oral contracts with deceased persons may be proved by direct evidence or by corroborating testimony in the nature of admissions or statements to third parties, facts, circumstances or conduct consistent with the making of contracts, performance attributable to the contractual relationship, the failure to compensate otherwise for performance and by any other competent evidence which may create a convincing implication that a reasonably certain contract was made which, with equity, may be enforced." (Syl. ¶ 3.)

And in *Bichel v. Oliver,* 77 Kan. 696, 95 Pac. 396, an action to enforce an oral agreement to devise property in consideration of services rendered, the court stated:

"If . . . the contract is sufficiently certain and definite in subject-matter and purpose and has been clearly and certainly established by the evidence,

and the facts are such as to take it out of the operation of the statute of frauds, and there are no circumstances or conditions which would make enforcement inequitable, courts do not hesitate to give effect to a contract, although it is not in writing. . . . it is not essential that it be established by direct evidence. If the facts and circumstances brought out are such as to raise a convincing implication that the contract was made and to satisfy the court of its terms, and that there would be no inequity in its enforcement, it is enough. [Citations.] This is especially true where, as here, the parol evidence is supplemented and supported by the acts of the parties." (p. 700.)

Appellant contends there was no clear and convincing evidence of the alleged oral contract entered into between appellees and the decedent, Celia Billinger, formerly Celia Dreiling; that their only evidence was circumstantial and had no corroborative support apart from their testimony. We cannot agree.

Five days were consumed in hearing the evidence in this case, most of the testimony and exhibits received being that produced on behalf of appellees. The record on appeal consists of more than five hundred pages, again most of it being evidence favorable to appellees. It would serve no useful purpose to anyone to detail it much beyond that stated in the trial court's findings. Suffice it to say, those factual findings are abundantly supported by competent evidence. That evidence reveals a long course of conduct by both Celia and the appellees supporting the latters' cause. The initial agreement, made shortly after the death of John P. Dreiling, was definitely and clearly shown by the direct testimony of each appellee, as set out in the court's finding No. 6. In addition each appellee testified that on several subsequent, plainly identified occasions Celia repeated the same promise to the effect they would receive all her property at her death except the bequest to the church and the Nick Dreiling quarter which Nick had previously owned but had lost during the depression. Corroboration of the agreement was shown in many respects as set forth in finding No. 7. Celia commented several times that various tracts of her land would make nice future homes for appellees' six children, identify-each tract with the name of a child.

Moreover, appellees had had two previous experiences of employment with Celia which did not turn out well for them with the result they quit and left Celia and her then husband, John Dreiling. In returning again only after Celia's repeated urgings, they gave up a way of life more agreeable to them than that which they knew from past experience they were likely to endure in the future. Celia was portrayed by all as a parsimonious, suspicious,

demanding person, whose wants and needs were not easy to satisfy. Appellees put forth tremendous effort to comply with all requests asked of them and dutifully carried out their part of the bargain. They did many things for her of a personal nature which an employee or tenant would never have been expected to do for the wages paid. For example, Celia did not operate an automobile until taught by Kenneth shortly before her death, and while Mr. Dreiling lived, Dorothy drove her mother from Celia's home and beauty shop in Hays to the farm and back, a distance of nearly ten miles each way, at noon and again at night. After Mr. Dreiling's death these trips were reduced to one every evening, the purpose being for Celia to check up on all farm work done and produce gathered. On Sundays appellees chauffered Celia over the countryside to look over her extensive land holdings, which were located in five counties. Generally they were not reimbursed for the expense of these trips, nor were they always repaid by Celia for other items expended in her behalf or upon her property. They also performed many other services for Celia of an intimate nature to the extent she virtually dominated their lives while, at the same time, they were having and rearing their children. Celia appeared to be genuinely fond of these grandchildren and participated completely in, and enjoyed, appellees' family life. In addition to the ordinary farm work entailed in producing crops, appellees also raised chickens and kept cattle, both dairy and beef, and sold eggs and cream for Celia. They repaired, remodeled and repainted at least five of her tenant properties with the expectation they were going to occupy them—which occurred but once. They performed many other tasks and errands for Celia, being virtually on call at all hours of day or night. More could be said respecting their performance under difficult conditions, all of which properly can be considered as further corroborative evidence that such a contract as alleged by appellees was in fact made. We must conclude the evidence was sufficiently clear and convincing to support the findings made.

Appellant's next two specifications of error may be treated together. He contends it would be inequitable to enforce the contract and that specific performance should be denied because appellees' services are fully compensable in money. He argues appellees did not perform the contract to Celia's expectations and were well compensated for what they did and should not inherit an estate which is said to be valued at about one million dollars. The trial

court specifically found Celia, and not appellees, had breached the contract and that appellees had performed their part of the bargain. These findings too are amply supported by evidence. Even after appellees had left Celia's farm at her request, she continued to insist that appellee Kenneth do many things for her until shortly before her death, including farm work and personal services, all of which requests Kenneth fulfilled. The fact that Celia saw fit to renounce her part of the bargain by executing a new will does not relieve her estate. A similar instance arose in *Heery v. Reed*, 80 Kan. 380, 102 Pac. 846, where this court said:

"The discharge operated, it is true, as a breach of the contract, and when it occurred Maggie [claimant] had the option to treat the contract as broken and sue for damages. On the other hand, Devenney could not force his renunciation of the contract upon Maggie. She was at liberty to treat the renunciation as inoperative and to hold herself in readiness to do that which the contract required of her and await the death of the Devenneys for complete performance and full payment." (p. 385.)

Dorothy was Celia's only heir at law and, with her children, the natural object of her bounty. The group represented by appellant were collateral heirs, Celia's brothers and sisters and the brothers and sisters of her deceased husband, John Dreiling, as well as the children of any deceased brothers and sisters, a group with which Celia had little association. Appellees had sustained Celia prior to and throughout the life of the contract with material aid, comfort and assistance beyond that which could normally have been expected under the circumstances and they stood ready to continue to do so. As indicated, much of the service rendered was of a personal and intimate nature upon which it would be difficult, if not impossible, to place a monetary value. In *Jones v. Davis*, 165 Kan. 626, 197 P. 2d 932, this court, in a similar situation, said:

"Although courts will decline to decree specific performance where the services performed are inconsequential compared with the compensation contracted to be paid, they are reluctant to make a new contract for the parties, and where the contract pleaded and the proof adduced shows services extending over a long period, that services of an intimate and peculiar nature were performed, and that the claimant could not be adequately compensated in money and it would be inequitable to withhold enforcement of the contract, and the trial court so adjudges, the appellate court will not hold that the claimant could be compensated by a money judgment." (Syl. ¶ 4.)

Again, without further detailing the evidence, we think it may not be said as a matter of law that the record discloses a situation where specific performance should be denied for the reason such

relief would be inequitable or because appellees' demands may be compensated in money.

Finally, appellant complains generally respecting the reception of certain evidence offered by appellees, particularly that as to events occurring prior to the making of the August, 1964, contract and evidence respecting Celia's personality. Actually there were few objections to evidence made on any ground during the course of the entire trial and nearly all that now complained of was received without objection. We discern no error in that received to which objection was made or of which complaint is now made. Essentially it was relevant to an understanding of the terms of the contract contemplated by the parties and how each performed under it.

No error appears in the trial court's judgment and it is affirmed.

APPROVED BY THE COURT.

O'CONNOR and PRAGER, JJ., not participating.