(719 P.2d 7)
No. 57,748

In the Matter of the Estate of William B. Moe, Deceased. IDA E. TURNER, *Appellee,* v. WILLIAM W. MOE, Administrator of the Estate of William B. Moe, Deceased, *Appellant.*

Opinion filed May 15, 1986.

J. *Stan Sexton* and *John Q. Royce,* of Hampton, Royce, Engleman & Nelson, of Salina, and *Fred Swoyer,* of Swoyer & Simms, of Belleville, for the appellant.

*John C. Nodgaard* and *Milo M. Unruh, Jr.,* of Arn, Mullins, Unruh, Kuhn & Wilson, of Wichita, for the appellee.

Before ABBOTT, C.J., PAUL E. MILLER, District Judge, assigned, and JAMES P. BUCHELE, District Judge, assigned.

BUCHELE, J.: This action arises out of a claim against the estate of William B. Moe filed by Ida E. Turner, former housekeeper of the decedent.

Decedent died intestate on August 19, 1983. A petition for administration of his estate under the Kansas Simplified Estates Act (K.S.A. 59-3201 *et seq.*) was filed, and William W. Moe, son of the decedent and his only heir-at-law, was appointed as administrator of the estate.

Subsequent to the opening of this estate, Ida E. Turner filed a petition for allowance of claim against the estate seeking the sum of $225,978.17 as consideration "due and owing as of January 1, 1984 for services performed by said Ida E. Turner for William B. Moe for the period July, 1969 through May of 1983." Additionally, she sought to recover the sum of $809.50 for the sale of certain items of personal property allegedly owned by her but sold by decedent in a farm sale held in July 1980, and for the return of some specific items of personal property.

Turner's claim was originally tried before the district magistrate. The district magistrate heard the testimony of twenty-three witnesses and received numerous exhibits into evidence. The magistrate denied Turner's claim in its entirety. This decision was appealed to the district court. The only evidence presented to the district court was the trial transcript and exhibits from the hearing before the magistrate. The district court reversed the

magistrate and found that the decedent orally promised to will certain property to Turner, and ordered specific performance of the contract by way of conveyance to Turner of a tract of land known as the "pig pen" and a sum of money equal to the sale price of another tract of land known as the "home place" to Turner. The administrator appeals this decision.

When a case is submitted to the district court on appeal from a district magistrate on the printed record, without oral testimony, it is the duty of the district court to reexamine that record and make its own findings of fact and conclusions of law. K.S.A. 59-2408. See generally *In re Estate of Neis*, 170 Kan. 254, 260, 225 P.2d 110 (1950).

On appeal from a decision of the district court on written and documentary evidence, the appellate court has the same opportunity to examine and consider the evidence as the trial court. *Stith v. Williams*, 227 Kan. 32, 605 P.2d 86 (1980); *In re Estate of Broadie*, 208 Kan. 621, 493 P.2d 289 (1972). The facts of this case are as follows.

In September of 1969, Ida E. Turner, the appellee, was employed by one Albert "Cap" Moe, father of the decedent herein, to perform live-in housekeeping services. These services were performed at the home of Cap Moe, which was situated on an 80-acre farm known as the "home place."

For performing the household services for Cap Moe, Turner received $20 per week. In September of 1969, Cap Moe died. Following his death, William B. Moe, the decedent herein, retained Turner to perform similar housekeeping chores at the same rate of pay.

From the period September 1969 through July 1980, Turner continued to perform housekeeping services at the home place for William B. Moe. Turner's brother, Bud Herda, moved into the home place after Cap Moe's death.

At the inception of Turner's care for the decedent, he was 67 years of age and in fairly good physical and mental health. Between 1969 and July 1980, the physical condition of the decedent deteriorated. During this time he incurred several hospitalizations as a result of ulcers, strokes, an amputation of part of a foot and other medical ailments. As a result of the decedent's worsening health he eventually became confined to a wheelchair.

Due to the decedent's deteriorating health, he required more care and became unable to perform the necessary and daily chores associated with the operation of the home place, which were assumed by Turner and her brother. These chores included looking after and caring for cattle, pigs and fowl, mending fences, hauling grain and livestock to market, tending a garden, helping put up hay, and running errands. Neither Turner nor Herda were compensated for the farm duties. However, the decedent and Turner did share the profits from the hog-feeding operation from which Turner earned $1,000 to $1,500 per year.

Prior to November of 1976, Turner claims the decedent promised that if she would continue to perform the household duties and in addition take care of the farm, he would leave her the "home place" and an additional tract of land known as the "pig pen," and see that she was "taken care of." The decedent made this statement on more than one occasion prior to November of 1976.

In November of 1976, the decedent executed a Last Will and Testament which left to Turner the "home place," the "pig pen," and various other real and personal property, including the residue of the decedent's estate. Turner was shown a copy of this will.

On February 6, 1978, the decedent executed a second will, which was almost identical to the first will with the exception of one small piece of property not relevant here. Turner was given a copy of this will. This second will was apparently destroyed sometime after January 8, 1980, when decedent obtained delivery of it from the scrivener.

On June 5, 1979, an altercation occurred between Turner and William W. Moe (Billy Moe), son of the decedent, relative to the care, or lack thereof, being rendered by Turner to the decedent. The parties' versions of what actually happened are disparate. However, as a result of this confrontation, Turner and her brother left the home place at Billy Moe's insistence. Turner went to Wichita to stay with her daughter, and remained there for about one week. She then returned to decedent's home, after several requests from the decedent, and resumed her duties at the home place until it was sold in July 1980.

The June 1979 altercation between Turner and Billy Moe had to do with Turner's drinking. On Thanksgiving Day, 1979,

Turner burned the turkey and decedent was not fed dinner due to Turner's drinking with her daughter and her brother. By January 1980, the decedent was so disenchanted with Turner's drinking that he told at least two disinterested persons that he had asked Turner to straighten up her drinking, and that she wouldn't do it, so he decided to sell the home place. Billy Moe felt Turner neglected caring for his father at least in part due to her drinking. Decedent's dissatisfaction with Turner's drinking and care was the impetus for his decision to sell the home place and move to town.

Before July 1, 1980, decedent purchased a house for $6,000 for Turner to live in and placed the title in her name. Decedent moved into a house he previously owned about three blocks away. After the move to town in July 1980, decedent continued to pay Turner about $20 per week. Turner no longer provided continuous and total care for the decedent, but did assist him by daily visits, taking him for rides, and doing laundry and miscellaneous household chores. She, of course, performed no work on the farm as it had been sold, and by this time the hog-feeding operation had ceased. After the move to town, Billy Moe assumed a greater role in his father's care. He took him out for meals twice each day and assumed full responsibility for administering his father's medications.

Appellant claims that Turner failed to produce evidence which is clear and convincing. The burden of proving a claim against a decedent's estate rests with the claimant and must be established by clear and convincing evidence, whether the claimant seeks specific performance of an oral contract or recovery under a theory of quantum meruit. *Jones v. Estate of Cooper*, 216 Kan. 764, 533 P.2d 1273 (1975); *In re Estate of Winters*, 192 Kan. 518, 389 P.2d 818 (1964).

Speaking to the standard of proof when the basis for the claim is an oral contract with a person since deceased, the court in *In re Estate of Shirk*, 194 Kan 424, Syl. ¶ 2, 399 P.2d 850 (1965), said:

"The term 'clear and convincing evidence' means that the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the contract must be narrated exactly and in order; the testimony must be clear, direct and weighty, and the witnesses must be lacking in confusion as to the facts at issue."

The courts have recognized that claims such as these are "inherently dangerous" because they offer a great temptation to set

up fraudulent claims against the estates of deceased persons, and thus they have required clear and convincing evidence to establish the claim. See *In re Estate of Shirk*, 194 Kan. at 429. See also *In re Estate of Billinger*, 208 Kan. 327, 332, 491 P.2d 924 (1971). Although proof beyond a mere preponderance of the evidence is required to establish the claim, every fact need not be proven beyond a reasonable doubt. *Billinger*, 208 Kan at 332; *In re Estate of Wert*, 165 Kan. 49, Syl. ¶ 3, 193 P.2d 253 (1948).

We have reviewed the record in this case and conclude that there is clear and convincing evidence to establish that the decedent did promise to will Turner the pig pen and the home place, in addition to paying her for housekeeping, if Turner would care for him and the farm until his death. This agreement is confirmed by the testimony of Turner, Bud Herda, and Mary Riley, Turner's daughter. The existence of this agreement is further confirmed by the terms of the 1976 and 1978 wills, the testimony of Keith Allen, purchaser of the farm, and the testimony of Sam Sanderson, a neighbor.

Turner clearly expected more than her stipend as compensation. She did not return to the farm after the June 1979 altercation until after she had checked with an attorney, who confirmed with decedent's lawyer that Turner would be taken care of. She was never told that decedent had destroyed his will. This evidence is sufficient to establish that Turner performed her services in reliance on the agreement. See *Jones v. Estate of Cooper*, 216 Kan. 764.

Appellant contends that it was error for the district court to grant specific performance of the oral contract when the petition for allowance of a claim, the arguments and briefs of Turner's counsel show that the claim was being made under the theory of quantum meruit.

A review of the petition for allowance of a claim in this case shows the appellant was given notice of the facts giving rise to an action based on the theory of an oral contract to will. This pleading clearly gives notice that the claim was based on the promises of the decedent to leave Turner specific property.

Under the Kansas Code of Civil Procedure, the pleading of a precise cause of action is not required. The real function of pleading is to give notice, and in line with the concept of notice pleading, pleadings are given liberal construction under the

code. K.S.A. 60-208; see 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-208 (1979). And it has long been held that a petition for allowance of demand in probate proceedings is to be liberally construed. See *In re Estate of Ray*, 180 Kan. 634, 306 P.2d 190 (1957). It was not error for the district court to render equitable relief that it deemed justified from the evidence. See *Fuqua v. Hanson*, 222 Kan. 653, 567 P.2d 862 (1977).

Turner filed her petition for allowance of demand on January 18, 1984. Appellant contends that since the claim was filed more than three years after the home place was sold and Turner moved to town and ceased caring for the farm and the decedent, her claim is time barred by K.S.A. 60-512.

Generally, a cause of action accrues as soon as the right to maintain the action arises, *i.e.*, when the plaintiff could have first filed and successfully prosecuted the action. *Clark Jewelers v. Satterthwaite*, 8 Kan. App. 2d 569, 662 P.2d 1301 (1983). It is the general rule applicable to oral personal services contracts that when a decedent promises to leave certain property at death to the claimant, but prior to death repudiates the contract or conveys the property to another, the promisee may elect to continue performance or be available for performance of the contract until the time of promisor's death; and the statute of limitations runs not from the time of the anticipatory breach, but from the time fixed for performance by the defaulting party. *In re Estate of Ray*, 180 Kan. at 636; *Heery v. Reed*, 80 Kan. 380, 102 Pac. 846 (1909). See also Annot., 94 A.L.R. 455.

The Supreme Court has made exceptions to this rule. In *Engelbrecht v. Herrington*, 101 Kan. 720, 172 Pac. 715 (1917), the court found the statute of limitations had run on a claim by a son seeking to enforce an oral agreement with his father in which the father agreed to leave the son one-half of the property if the son would stay and work on the farm and help pay off the mortgage. The son fully performed his part of the agreement, but brought no action when his father sold the land. Instead, the son sought damages at the time of his father's death. The court reasoned as follows:

"The contract being fully executed on the part of the plaintiff and performance on the part of his father being a legal impossibility, the contract was at an end and the rights of the plaintiff then fully accrued. The action of the father was more than a renunciation which the plaintiff at his option might or might not elect to treat as a breach of the contract . . . . There was no occasion or excuse to await

the death of the plaintiff's father and mother, as performance was beyond the power of the father, and nothing that the plaintiff could do thereafter would revitalize the contract or enable him to obtain a share of the land that had been conveyed to a stranger. Whether he sought damages in lieu of the land or the value of his services on the *quantum meruit*, his cause of action had accrued when the conveyance was made, and from that time the statute of limitations was running against him." 101 Kan. at 724.

In the case at bar, due to the sale of the farm the decedent could not perform his part of the contract to will the home place, and Turner could not perform her part of the contract to care for the farm and continue providing live-in housekeeping services for the defendant.

In continuous services contracts, the courts do not permit the promisor to force a renunciation on the promisee and set up a circumstance which renders full performance impossible. *Heery*, 80 Kan. at 385. On the other hand, claimant must carry the burden to show by clear and convincing evidence that she is entitled to recover under the contract. In order to meet this burden, persons claiming against a decedent's estate must prove by clear and convincing evidence that, after the anticipatory breach by the decedent, they fully performed or continuously stood ready, willing, and able to perform their part of the contract. When neither party is capable of performing his or her part of a continuous services contract, it is at an end and the statute of limitations begins to run on claims arising out of the contract at that time.

After July 1, 1980, the parties lived separately and Turner was no longer primarily responsible for continuous and total care of the decedent. A significant amount of the responsibility for meals, medicine and general supervision was assumed by Billy Moe. Decedent's decision to sell the farm was due to his dissatisfaction with Turner's drinking and its interference with the care he received. This sale was not precipitated unilaterally, but in response to Turner's voluntary actions. As a result of the move to town after the home place was sold, Turner was no longer needed to do the farm work which was an integral part of the parties' agreement. The record does not show by clear and convincing evidence that Turner stood ready or was able to perform the services requested of her under the contract after July 1, 1980.

The record does not reflect a new agreement of the parties or

that Turner made any objection when these circumstances were changed. Turner was continued on the salary which she had received in the past attributable to household work. In addition, she was provided a house of her own in which to live. These are substantial changes in the circumstances of both parties which indicate to us that this contract ended upon the sale of the farm.

We find no reason to extend the time for beginning the running of the statute of limitations beyond July 1, 1980, under these facts. Any claim or cause of action Turner had could have been brought as of that date. Since Turner's claims for specific performance of the oral contract or for value of services rendered arose on or before July 1, 1980, and were not filed until more than three years after the statute began to run, they are time barred.

The district magistrate correctly determined that the statute of limitations had barred Turner's claim for personal property sold at the farm sale.

Finally, as to the three-year period preceding the filing of this claim, we find that Turner has not established a contract to receive more than she was paid, or that her services had a value greater than what she had been compensated.

The final issue raised in this appeal was whether the testimony of the rebuttal witnesses should have been considered. The district magistrate excluded testimony of four townspeople who testified Turner continued to provide services after July 1, 1980. The rule to be applied to rebuttal evidence is found in *State v. Richard*, 235 Kan. 355, Syl. ¶ 1, 681 P.2d 612 (1984), as follows:

"Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts the witnesses on the opposite side, but also corroborates previous testimony."

In her case in chief, Turner testified that she continued to perform services for the decedent after July 1980 until July 1983. At that point the testimony of various townspeople to corroborate her assertion would have been cumulative. However, Billy Moe's testimony was almost totally opposite. The testimony of witnesses who corroborated Turner's version of the facts then became necessary to rebut or contradict Billy Moe's testimony.

Since our review and that of the district court is made de novo, we need not concern ourselves with whether or not the magistrate abused his discretion in not admitting the evidence. We believe the proffered rebuttal testimony is admissible and have considered it in making this decision.

The district court is reversed. The decision of the district magistrate disallowing the claim is affirmed.