No. 57,748

In The Matter of the Estate of WILLIAM B. MOE, Deceased.

IDA E. TURNER, *Appellee*, v. WILLIAM W. MOE, Administrator of the Estate of WILLIAM B. MOE, Deceased, *Appellant*.

(729 P.2d 447)

Opinion filed December 5, 1986.

*J. Stan Sexton*, of Hampton, Royce, Engleman and Nelson, of Salina, argued the cause, and *John Q. Royce*, of the same firm, and *Fred Swoyer*, of Swoyer and Simms, of Belleville, were with him on the brief for appellant.

*Milo M. Unruh, Jr.*, of Arn, Mullins, Unruh, Kuhn and Wilson, of Wichita, argued the cause, and *John C. Nodgaard*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: During the probate of the estate of William B. Moe (Moe), the district judge at a de novo hearing reversed the district magistrate judge's denial of the claim of Ida Turner (Turner) against the estate and ordered specific performance of an agreement between the deceased and Ida Turner for services rendered during Moe's lifetime. William W. Moe, administrator

of the estate, appealed the district judge's decision. The Court of Appeals agreed with the district judge's finding that Turner was entitled to specific performance of the oral agreement, but held that her claim against the estate was barred by K.S.A. 60-512's three-year limitation for bringing an action on oral agreements. *In re Estate of Moe*, 11 Kan. App. 2d 244, 719 P.2d 7 (1986). Turner, in her petition for review, claimed that the Court of Appeals incorrectly found that K.S.A. 60-512's limitation barred her claim. We granted review.

Moe died intestate on August 19, 1983. A petition for administration of his estate under the Kansas Simplified Estates Act, K.S.A. 59-3201 *et seq.*, was filed, and William W. Moe, son of the decedent and his only heir-at-law, was appointed as administrator of the estate.

Ida E. Turner filed a petition for allowance of claim against Moe's estate seeking $225,978.17 due and owing as of January 1, 1984, for services performed by Turner for Moe from July 1969 through May of 1983.

Turner's claim was originally tried before the district magistrate. After hearing witnesses and reviewing the exhibits, the district magistrate denied Turner's claim. Turner appealed to the district judge and received a hearing de novo based on the transcript of the prior hearing. K.S.A. 59-2408. The district judge found that Moe had orally promised to will certain property to Turner. He ordered specific performance of the contract by conveyance of the "pig pen" and a sum of money equal to the sale price of the "home place" to Turner.

The administrator appealed. The Court of Appeals found that there had been an oral contract between Moe and Turner, but that the contract had been breached when Moe sold the home place in 1980. It concluded that Turner's 1984 claim against Moe's estate was barred by the statute of limitations. We now reverse the Court of Appeals and find that Turner's claim is not barred by the three-year limitation of K.S.A. 60-512.

Prior to September 1969, Turner was employed as a housekeeper on the home place by Albert "Cap" Moe, father of the decedent. In return for her housekeeping services, Turner received room, board, and $20 per week. Following "Cap" Moe's death, William W. Moe employed Turner as his housekeeper on the home place under a similar oral contract.

Turner performed housekeeping services for Moe from September 1969 though June 1980. Moe was 67 years old in 1969 and in reasonably good health. Between 1969 and 1980, his health deteriorated markedly. He was hospitalized several times for ulcers, strokes, and the amputation of part of a foot. When he could no longer perform chores around the farm, Turner and her brother assumed those duties.

Prior to November 1976, Moe, at various times, promised Turner that if she would continue performing the housekeeping and other services, he would leave her the home place and another tract of land known as the "pig pen."

On November 18, 1976, Moe executed a will leaving Turner the home place, the pig pen, and various lots in Scandia, Kansas; the cash in his bank account; his personal property; and all of the residue of his estate except that bequeathed to his son, William W. Moe. Turner received a copy of this will. On February 6, 1978, Moe executed a second will leaving the home place, the pig pen, the Scandia lots, the personal property, and the estate residue to Turner and her daughter, Mary K. Riley. Turner also received a copy of this will.

On June 5, 1979, an altercation occurred between Turner and William W. Moe concerning Turner's drinking. As a result, Turner left the home place and went to stay with her daughter in Wichita. During the week Turner was in Wichita, Moe repeatedly called Turner and asked her to return to the farm to care for him. After consulting with an attorney about her rights, Turner agreed to return. She resumed her housekeeping chores and lived in the home place until it was sold in July of 1980.

Moe's dissatisfaction with Turner's drinking and the resulting neglect of her work provided the impetus for him to sell the home place and move to town. Moe purchased a second house in Scandia and placed the title in Turner's name. Turner then moved into that house which was a short distance from the house where Moe lived. From July 1980 until Moe's death, Turner continued to perform housekeeping chores for Moe, and he continued to pay her $20 per week for her services. During this time Moe's son assumed a greater role in the care of Moe, daily taking him out to meals and administering his father's medications.

Turner raised six issues in the Court of Appeals. The Court of

Appeals found that: (1) the pleadings were sufficient to establish a claim for specific performance of an oral contract; (2) the proffered rebuttal testimony was admissible; and (3) there was clear and convincing evidence to establish that the decedent did promise Turner the pig pen and the home place, in addition to paying her for housekeeping, if Turner would care for him and the farm until his death. The Court of Appeals ruled against Turner's claim, finding it was barred by the statute of limitations, and therefore did not consider whether collateral estoppel was appropriate. On petition for review, Turner raises two issues:

1. Whether Turner's claim based on an oral contract to provide services is barred by the statute of limitations.

2. Whether the administrator is collaterally estopped from asserting a statute of limitations defense.

The administrator claims that, because Turner knew the home place was sold in 1980, the three-year statute of limitations for the breach of the oral contract began to run at the time of the sale. Turner argues that since she continued to perform services for Moe, the statute of limitations did not begin to run until Moe's death.

General contract law provides that once performance has begun and prevention of further performance takes place by repudiation or otherwise, there is an actual breach and further performance is excused. We recognized an exception to the general rule in *Schaffner v. Schaffner*, 98 Kan. 167, 157 Pac. 402 (1916), where if there is a single hiring and the term of service of the employee and also the time when his compensation shall become due are not fixed by agreement, and the hiring and service continue without interruption or payment until the death of the employer, the employment, in the absence of the evidence of a general custom or usage, may be deemed continuous. Under such circumstances, the statute of limitations will not begin to run against a claim for compensation until the services have ended.

Some noted authorities are critical of the exception to the general rule. As noted in 18 Williston on Contracts § 2027B, pp. 796-99 (3rd ed. 1978):

"Nevertheless, many courts call such repudiation after part performance an anticipatory breach, and allow the injured party a so-called election, which is necessarily fictitious, to continue the contract. Such courts, consequently allow an injured promisee, if he elects, after breach of a contract to keep it alive, to

compute the statutory period not from the time of the breach, but from the time when ultimate payment or performance was promised.

"This is inconsistent with the general theory that the Statute begins to run as soon as there is a cause of action. The idea that the injured party may elect not to call a breach something that is a breach, or that he may elect to continue a contract when the wrongdoer will not let him continue it, is not logically defensible, whatever authorities may be cited in its favor.

"Many of the decisions holding that the statutory period may be computed from the later date were based on contracts to work for or to support a promisor in return for his promise to pay in whole or in part for the work or support by leaving at his death property to the promisee, and where, because of the promisor's fault, the work or support has not been fully given.

"Such decisions are opposed to the generally, although not universally, accepted doctrine that a discharged employee acquires immediately a right of action for his entire damages, and cannot split his cause of action by recovering in several actions for the successive payments or performances promised in the contract.

"Some decisions on contracts other than those for future support likewise permit the statutory period to be calculated from the time when final performance becomes due, rather than from the time when a breach takes place that terminates any actual possibility of further performance."

Three Kansas cases are relevant in determining when the K.S.A. 60-512 three-year statute of limitation bars Turner's claim for continuous services under the oral contract. In the first, *Heery v. Reed*, 80 Kan. 380, 102 Pac. 846 (1909), Reed sought to recover against the decedent's estate for services Reed had performed for the decedent during his lifetime. Reed lived with the decedent for 23 years performing housekeeping and farm chores. For Reed's services, the decedent had promised to give Reed all his property at his death. When Reed married, however, the decedent ordered her to leave. This court found that the statute of limitations had not run on her claim even though more than three years had elapsed between her discharge and the decedent's death. This court said Reed had the option to treat the contract as broken and sue for damages or claim the renunciation as inoperative and hold herself in readiness to do what the contract required and await the death of her employer to complete the performance and receive full payment.

In *Engelbrecht v. Herrington*, 101 Kan. 720, 172 Pac. 715 (1917), it was determined that the statute of limitations had run. There, the father promised the son that if he "would stay at home, work upon the farm and help earn money enough to pay the mortgage debt against it," the son would receive half the farm after the father and his father's wife had died. 101 Kan. at

721. The son stayed on the farm and worked for about five years, during which time the mortgage was paid. Twenty years after performance by the son, the father sold the farm to another person. The son brought no action at that time. Instead, the son sought damages when his father died, six years after the farm had been sold. The *Engelbrecht* court held that when the father conveyed the farm to another, performance by the father became a legal impossibility, and the son's cause of action accrued at that time.

This case differs from *Engelbrecht* in that in *Engelbrecht* the son's performance was completed at the time of the sale. The mortgage had been paid off, and the court found that the contract was fully performed 32 years before the action was brought. The *Engelbrecht* court noted that *Heery* was not controlling because the son's services had been fully performed when the land was sold.

Neither *Heery* nor *Englebrecht* is exactly on point. In *Heery*, the decedent had not conveyed the property and, therefore, was not disabled from fulfilling his part of the contract, although he had prevented Reed from performing. In *Engelbrecht*, the plaintiff had performed his part of the contract many years before the land was sold. In the present case, Turner was willing to continue performing services. There is evidence to suggest she did continue providing services after a part of what had been promised her had been sold. She visited Moe daily and continued to provide care for him. Moe continued to pay her $20 a week for these services.

In a more recent case, *In re Estate of Ray*, 180 Kan. 634, 306 P.2d 190 (1957), Ray promised that if the claimant and her family would move into her home and make their home with her, she would leave the home to the claimant upon her death. The claimant and her family moved in and lived with Ray until she died intestate. It was then learned that five years prior to her death Ray had secretly deeded her property to her son and daughter. The court found that the claimant's demand to recover specific property was beyond her reach. Since the claimant had performed her services under the oral contract during the lifetime of Ray, the court concluded that she was entitled to recover on *quantum meruit* the reasonable value of her services to Ray

and that the statute of limitations commenced to run at the completion of the contract—the death of Ray.

In *Ray*, as in *Heery*, the claimants continued to perform or offer to perform their part of the contract for continuous service until the decedents' deaths. In *Heery*, the employer prevented the claimant from performing by sending her away. In *Ray*, the claimant was performing; but did not know that the employer had secretly given away the property she had promised to the claimant. The circumstances were different in *Engelbrecht*. The contract for service there was completed because the son had finished performing and did not attempt to establish his claim when the property he was promised was sold.

Turner worked hard maintaining a large garden, canning food, mending fences, helping with the livestock, and whatever else needed to be done until the home place was sold. In 1979, when William W. Moe evicted Turner from the house, it was William B. Moe who called her numerous times and asked her to come back. After they moved to town, Turner visited Moe every day and worked around the house. Moe continued to pay Turner $20 a week up until the time of his death. Moe still owned the pig pen at his death. If Moe had wished to rescind the contract, he would not have bought a house in town for Turner and continued paying her for her services. The Court of Appeals incorrectly applied *Engelbrecht* to the facts of this case.

Turner continued to perform under the contract and is entitled to receive what remained of that originally promised plus the value of what had been promised but sold. The district court correctly determined that Moe orally promised certain property to Turner for her continuous services until his death. The district court's award of the land known as the pig pen and a sum of money equal to the sale price of the home place was correct. Since we have determined that the statute of limitations had not run on Turner's claim, we are not required to determine the issue of collateral estoppel.

The decision of the district court is affirmed and the decision of the Court of Appeals is reversed.