No. 68,845

St. Francis Regional Medical Center, Inc., *Appellee/Cross-Appellant,* v. Marlon K. Weiss, M.D., *Appellant/Cross-Appellee.*

(869 P.2d 606)

Opinion filed March 4, 1994.

*Dennis D. Webb,* of Shultz, Webb & Lonker, Chartered, of Wichita, argued the cause and was on the briefs for appellant/cross-appellee.

*David G. Seely,* of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, argued the cause and was on the briefs for appellee/cross-appellant.

*William H. Pitsenberger,* general counsel, was on the brief for *amicus curiae* Blue Cross and Blue Shield of Kansas, Inc.

*James D. Griffin* and *H. Steven Walton,* of Blackwell Sanders Matheny Weary & Lombardi, of Overland Park, were on the brief for *amicus curiae* VHA Mid America, Inc.

*Charles R. Hay* and *Catherine M. Walberg,* of Goodell, Stratton, Edmonds & Palmer, of Topeka, were on the brief for *amicus curiae* Kansas Hospital Association.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The plaintiff, St. Francis Regional Medical Center, Inc., brought this action against the defendant, Marlon K. Weiss, M.D., to enforce their employment contract. Weiss appeals from the district court's denial of his motion for summary judgment and from the entry of judgment against him based on

the jury's verdict on the main claim. St. Francis cross-appeals from the rulings of the district court which allowed Dr. Weiss' counterclaim for unused vacation time and unpaid salary increase to be submitted to the jury and from the resulting judgment in his favor on the counterclaim. St. Francis also appeals the district court's denial of an award of prejudgment interest. The appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

On July 14, 1989, a Physician Employment Agreement between Physicians Clinic of Kansas, P.A., (PCK) and Marlon Weiss, M.D., was signed. The contract expressly provided for assignment to St. Francis Medical Center, Inc., (St. Francis, although, where the contract is quoted, the hospital corporation is referred to as "the Medical Center"). The contract further provided that upon assignment, "the Medical Center hereby employs the Physician and the Physician accepts employment with the Medical Center, as an employee of the Medical Center and as a member of a physician division of the Medical Center, to render full-time medical services for the Medical Center." The assignment occurred on August 7, 1989.

In late October or early November of 1989, concerns were raised with Dr. Weiss about the quality of his care of patients. At that time he was working in Wichita in the Southeast Health Care MOD, *i.e.*, medical office division, of St. Francis. On November 10, 1989, a memorandum was prepared which documented St. Francis' decision to transfer Dr. Weiss from Wichita to the Snyder Clinic in Winfield on or before January 1, 1990. The administrator for the physicians employed by St. Francis testified that Dr. Weiss' skills did not match "the pace" of the Wichita clinic, and the November 10 memorandum states that the transfer would allow him to be under the guidance of a certain doctor and further enhance his practice skills.

In the fall of 1990 and again in January 1991, Dr. Weiss traveled to Fort Dodge, Iowa, and visited the Fort Dodge Medical Center. During that period, Dr. Weiss was working out the details of an employment contract with the Fort Dodge Medical Center.

On March 17, 1991, Dr. Weiss requested in writing "a performance review as detailed in Exhibit A, section 2.1 of my contract." That paragraph provides in pertinent part:

"2.1 Annual Base Salary.

"Medical Center shall pay physician an annual base salary, the initial amount of which shall be $52,000. The annual base salary may be increased or decreased by Medical Center prospectively on a semi-annual basis effective as of January 1st and July 1st of each year, based on a regularly-conducted, performance review."

Sometime during "the first part of April" 1991, the administrator of the Snyder Clinic met with each of its physicians, including Dr. Weiss. Dr. Weiss was offered an increase to $85,863 from $83,990, retroactive to January 1. Dr. Weiss considered the proposed increase to be "a slap in the face." In a note, which is dated April 9, 1991, the administrator of the Snyder Clinic wrote to the administrator of St. Francis' Physician Division that Dr. Weiss was seeking an increase to $4,030 "per pay period."

On May 21, 1991, Dr. Weiss wrote to the executive director of St. Francis:

"I hereby give you notice of default as required under section 7.3-3 of my contract. You have breached your duty to perform a proper and timely performance review, in spite of my letter of March 17 specifically bringing this lapse to your attention."

Section 7.3-3 provides:

"Termination On Notice of Default. In the event either party shall give written notice to the other that such other party has substantially and materially defaulted in the performance of any other obligation under this Agreement, and such default shall not have been cured within 60 days following the giving of such notice, the party giving such notice shall have the right to terminate this Agreement at any time thereafter upon 30 days written notice of such termination to the other party."

In a letter dated May 31, 1991, the executive director responded that there was no default:

"It is my understanding that after receiving your letter of March 17, 1991 requesting a performance review, the review was conducted on April 9, 1991. If it is your position the review was not conducted, please let me know as our records would indicate the review was conducted in accordance with the Employment Agreement."

On June 6, 1991, Dr. Weiss gave written notice to St. Francis of his resignation, which was to be effective July 10, 1991. He stated that his "letter of May 21, 1991, was your notice that 60 days had expired per paragraph 7.3-3." He also asserted that the " 'attempt' to conduct a review on or about April 9" was not in

compliance with the terms of the contract and that the salary increase which he had been promised had not "been reflected" in his paycheck.

Section VII, Paragraph 7.1 of the employment agreement provided that it would be effective for an initial period of five years. Section VII, Paragraph 7.5 provided: *"Liquidated Damages for Failure of Consideration.* In the event of termination of this Agreement by Physician's election, breach, or default, Physician shall pay to Medical Center the amounts set forth in Exhibit E." Exhibit E is titled "Liquidated Damages." It provides in part:

"In the event of a termination by Physician under the provisions of Section 7.5, Physician shall pay the following amounts, determined according to the date on which employment actually terminates, to the Medical Center:

1. If terminated during the first year of the Initial Term of this Agreement, an amount equal to $67,996."

The amount to be paid if termination occurs during either the second or third years is $51,996, during either the fourth or fifth years is $25,998, and during any extension term is $1,000.

On July 12, 1991, St. Francis filed suit against Dr. Weiss, alleging that his July 10, 1991, termination breached the employment agreement which had been entered into on August 7, 1989. St. Francis sought actual damages, liquidated damages in the amount of $51,996, and prejudgment interest.

Dr. Weiss denied that he had breached the agreement and asserted the defense that the liquidated damages provision of the agreement is unenforceable under K.S.A. 1993 Supp. 17-2708 and *Early Detection Center, Inc. v. Wilson,* 248 Kan. 869, 811 P.2d 860 (1991). In a counterclaim, Dr. Weiss alleged that St. Francis had breached the agreement by not paying certain benefits to him.

Dr. Weiss filed a motion for summary judgment on the ground that the contract was unenforceable. Two arguments were made why the contract was void: First, a general corporation cannot contract for the provision of medical services; and second, the agreement violates 42 U.S.C. § 1320a-7b(b) (1988 and Supp. III 1991), the "Medicare Anti-Kickback" statute. At the hearing on Dr. Weiss' motion for summary judgment, his counsel withdrew that portion of the motion based on the federal anti-kickback provision. He conceded that St. Francis correctly stated that in

certain circumstances the employee/employer relationship was exempted "from the applicability of those provisions and . . . my brief . . . is not adequate to reduce that to a question of law. In other words, there are some questions of fact remaining. I think we're gonna have to go to trial to resolve that."

On the remaining ground, the district court reasoned that the rule from *Early Detection Center* did not apply to the agreement between Dr. Weiss and St. Francis because St. Francis is a nonprofit charitable corporation rather than a general corporation. The district court, therefore, concluded that the agreement was enforceable.

St. Francis filed a motion in limine requesting that "any evidence or reference with respect to [Dr. Weiss'] theory that the subject agreement violates the 'Medicare Anti-Kickback' statute be heard by the Court outside the presence of the jury." Dr. Weiss' counsel agreed "that shouldn't be in the presence of the jury." The district court granted St. Francis' request.

St. Francis' motion for directed verdict was denied by the district court on the grounds that Dr. Weiss was not required to elect between avoiding enforcement and enforcing the contract and that the damages allegedly sustained by Dr. Weiss could be set off against the liquidated damages.

The jurors completed a special verdict form. They agreed that St. Francis breached the contract by failing to conduct a performance review, but cured its breach on April 9, 1991. They further agreed that St. Francis breached the contract concerning unpaid vacation and unpaid salary and that as a result, Dr. Weiss incurred damages stipulated to be in the amounts of $8,269.23 and $969.23, respectively.

Judgment was entered in favor of St. Francis on its claim for liquidated damages in the amount of $51,996, which was set off by judgment in favor of Dr. Weiss in the amount of $9,238.46. Judgment, therefore, was entered on the jury verdict in favor of St. Francis in the net amount of $42,757.54. The district court denied St. Francis' request for prejudgment interest on the liquidated damages at the rate of 10% per annum from July 10, 1991.

Dr. Weiss raises the following issues on appeal:

1. Did the district court err in denying Dr. Weiss' motion for summary judgment, which was based on the rule prohibiting the corporate practice of medicine?

2. Did compensation under the employment agreement between St. Francis and Dr. Weiss constitute an illegal "kickback" in violation of 42 U.S.C. § 1320a-7b(b)?

3. Did the district court err in excluding from evidence an unexecuted employment agreement form?

St. Francis raises the following issues in its cross-appeal:

1. Should the district court have required Dr. Weiss to elect between remedies?

2. Did Dr. Weiss' repudiation of the employment agreement relieve St. Francis of the obligation to pay his unpaid vacation and unpaid salary?

3. Was there evidence to support Dr. Weiss' counterclaim for unpaid vacation and unpaid salary?

4. Should St. Francis have been awarded prejudgment interest on the amount of the liquidated damages?

We first consider if the district court erred in denying Dr. Weiss' motion for summary judgment. He contends that this case never should have gone to trial because, as a matter of law, the agreement was invalid and unenforceable. Pertinent portions of the district court's journal entry on Dr. Weiss' motion for summary judgment state:

"Plaintiff St. Francis Regional Medical Center, Inc., filed this action to enforce its 'Employment Agreement' with the defendant. Defendant has moved for summary judgment, on the ground that the Employment Agreement is unlawful and therefore cannot be enforced. Defendant argues that the Agreement is unenforceable under the decision of the Kansas Supreme Court in the case of *Early Detection Center, Inc. v. Wilson*, 248 Kan. 869, 811 P.2d 860 (1991).

. . . .

"The Court finds that plaintiff St. Francis Regional Medical Center, Inc., is a non-profit charitable corporation. The Court further finds that plaintiff is licensed by the State of Kansas as a healthcare provider and as a medical care facility.

"The Court concludes that the case of *Early Detection Center, Inc. v. Wilson* is distinguishable and is not controlling here. The Court concludes that plaintiff St. Francis Regional Medical Center, Inc., is not a 'general corporation' as that term is used in the *Early Detection Center* case. The Court further concludes that plaintiff St. Francis Regional Medical Center,

Inc., may lawfully enter into, and enforce, an employment contract with a physician. The Court therefore concludes that the Employment Agreement at issue in this case at bar is valid and enforceable."

Dr. Weiss states as his basic premise that Kansas case and statutory law prohibit the practice of medicine by general corporations and that any agreement between a general corporation and a physician to perform medical services for third parties violates the prohibition. He relies on *Early Detection Center*, 248 Kan. 869, Syl. ¶ 4: "A general corporation is prohibited from providing medical services or acting through licensed practitioners; therefore, there can be no contract between the general corporation and third parties to perform medical services."

In *Early Detection Center*, Dr. Wilson and a colleague formed a partnership, which they later incorporated as a professional corporation and then converted to a general corporation. The corporation's business was providing vascular testing medical services. Dr. Wilson resigned and formed a competing business. Early Detection Center sued Dr. Wilson, alleging that he had breached his contract not to compete. 248 Kan. at 870-71. The district court granted Dr. Wilson's motion for summary judgment on the ground that the corporation could not lawfully provide medical services. This court affirmed.

Early Detection Center argued that "a general corporation can lawfully provide medical services by employing licensed physicians." 248 Kan. at 872. Based upon its reading of provisions of the Kansas Healing Arts Act, K.S.A. 65-2801 *et seq.*; the Professional Corporation Law of Kansas, K.S.A. 17-2706 *et seq.*; the General Corporation Code, K.S.A. 17-6001 *et seq.*; the Health Care Provider Insurance Availability Act, K.S.A. 40-3401 *et seq.*; *State ex. rel. Fatzer v. Zale Jewelry Co.*, 179 Kan. 628, 298 P.2d 283 (1956); *State ex rel. Beck v. Goldman Jewelry Co.*, 142 Kan. 881, 51 P.2d 995 (1935); and *Winslow v. Board of Dental Examiners*, 115 Kan. 450, 233 Pac. 308 (1924), this court rejected the argument. 248 Kan. at 872-77.

This court's basic rationale in refusing to enforce the agreement between Early Detection Center and Dr. Wilson was as follows: In Kansas, the practice of medicine requires a license. An examination must be taken in order to obtain a license. Because only individuals can take examinations, only individuals can be

licensed to practice medicine. The *Zale, Goldman,* and *Winslow* cases, decided in 1956, 1935, and 1924, respectively, equated a corporation's employing a licensed professional individual who practiced dentistry or optometry with a corporation's practicing that profession. When the legislature subsequently enacted the Healing Arts Act, the Professional Corporation Law, and the General Corporation Code, it had the opportunity to include provisions which would have changed the judicial interpretation, but it did not do so. Thus, the rule that a general corporation is prohibited from providing medical services or acting through licensed practitioners still applies.

The court ended its discussion of the corporation laws and the question whether they departed from the judicial interpretation of the dentistry and optometry cases with the following conclusion: "The legislative enactment of K.S.A. 1989 Supp. 17-2708 does not authorize the practice of medicine by a general corporation or allow a general corporation to provide professional services under the supervision of a licensed practitioner." 248 Kan. 869, Syl. ¶ 3. K.S.A. 1989 Supp. 17-2708 provided:

"Except as otherwise provided, the Kansas general corporation code contained in K.S.A. 17-6001 *et seq.* and amendments thereto shall apply to a professional corporation organized pursuant to this chapter. Any provisions of the professional corporation law of Kansas shall take precedence over any provision of the Kansas general corporation code which conflicts with it. The provisions of the professional corporation law of Kansas shall take precedence over any law which prohibits a corporation from rendering any type of professional service. Any person or organization as defined in K.S.A. 17-2707 and amendments thereto which is authorized to form a professional corporation also may incorporate under the Kansas general corporation code contained in K.S.A. 17-6001 *et seq.* and amendments thereto."

We paraphrased that portion of 17-2708 which provides for the professional code to prevail over the general one. 248 Kan. at 876. The court then stated that "[t]he legislature intended that any professional corporation, engaged in the practice of healing arts, which converts to a general corporation be prohibited from engaging in the practice of any branch of the healing arts." 248 Kan. at 876. Support for the conclusion was found in a general corporation's not being included in the Health Care Provider Insurance Availability Act's definition of health care providers, K.S.A. 40-3401(f). Additional support was found in the legisla-

ture's amending the technical professions (architecture, surveying, engineering) licensing statutes to authorize practice of the technical professions by a general corporation, K.S.A. 74-7036(c), and not including a similar provision in the Kansas Healing Arts Act. 248 Kan. at 876-77.

In the present case, Dr. Weiss contends that the district court's distinguishing St. Francis from the Early Detection Center as a nonprofit corporation is unsound. He argues that the term "general corporation" includes both stock corporations and membership (nonprofit) corporations and that both are governed by the General Corporation Code. He also argues that there are compelling public policy considerations beneath the prohibition of corporations practicing medicine which pertain no matter which type of general corporation is involved. Those considerations may be summarized as follows: (1) Corporate judgment may be substituted for medical judgment; (2) corporations are not subject to standards of ethics; and (3) an independent judgment on the part of the physician is necessary in order to serve as a patient advocate with the competing institution. Dr. Weiss selected these considerations from a list of "Consequences of Eliminating the Corporate Practice Rule," which appeared in the Iowa Medical Society Position Paper opposing changes in that state's existing law.

It is Dr. Weiss' position that his contract with St. Francis, which tied his compensation to marketing and volume of patients and cost-effective use of St. Francis' resources, demonstrates why the public policy considerations are equally applicable to a nonprofit corporation.

St. Francis, on the other hand, contends that neither Kansas case law nor statutory law prohibits the practice of medicine by general corporations. St. Francis states that "[n]o Kansas statute prohibits a licensed hospital from employing physicians" and "[n]o Kansas case has ever held that a hospital or non-profit corporation, such as St. Francis, may not employ the services of physicians." With regard to statutory law, the rationale of *Early Detection Center* does not conflict with St. Francis' contention. The prohibition of the corporate practice of medicine was based on a judicial interpretation, which had not been expressly overturned by legislation, rather than on any statutory provision(s). With regard to case law, *Early Detection Center* involved neither a

hospital nor a nonprofit corporation, and, according to St. Francis, its application should not be extended to either.

Referring to this court's observation that the definition of health care provider in the Healing Arts Act did not include a general corporation, St. Francis points out that "a medical care facility licensed by the department of health and environment" and "a Kansas not-for-profit corporation organized for the purpose of rendering professional services by persons who are health care providers" are statutorily defined as health care providers. K.S.A. 40-3401(f). St. Francis, unlike Early Detection Center, fits into both these categories as well as into that of a general corporation. St. Francis argues, therefore, that it is statutorily permitted to provide medical services through licensed practitioners.

It would not necessarily seem to follow from St. Francis' being included in the K.S.A. 40-3401(f) definition of a health care provider that St. Francis is statutorily authorized to practice medicine through licensed practitioners. That definition of health care provider is for use in the Health Care Provider Insurance Availability Act, and it is not the exclusive statutory definition of health care provider. For instance, K.S.A. 65-468(a), which defines health care provider for the rural health network statutory scheme, differs substantially from 40-3401(f). The defining of some subspecies of general corporations as health care providers in 40-3401(f), however, does tend to support St. Francis' argument that *Early Detection Center* should not be extended beyond its facts.

St. Francis also offers as a reason for not extending the holding of *Early Detection Center* to the present case that the public policy considerations raised by Dr. Weiss do not apply to a nonprofit hospital. St. Francis states: "Its purpose is to make health care available to the community. It does not produce profits for shareholders, and is not operated or managed for profit. Net revenues, if any, are used solely to sustain operations and to further St. Francis's charitable mission." St. Francis quotes cases from other jurisdictions for the proposition that "many courts" have created an exception for nonprofit corporations to the general prohibition of the corporate practice of medicine. The California Supreme Court stated in 1938: "[S]ince the principal evils attendant upon corporate practice of medicine spring from the conflict between the professional standards and obligations of the doctors

and the profit motive of the corporation employer, it may well be concluded that the objections of policy do not apply to non-profit institutions." *People v. Pacific Health Corp.*, 12 Cal. 2d 156, 160, 82 P.2d 429 (1938), *cert. denied* 306 U.S. 633 (1939). The New York Municipal Court stated in the same year: "The general rule that a corporation may not practice medicine has its exception in charitable hospital corporations which are organized for that express purpose and are sanctioned by law to treat the sick and injured." *Goldwater v. Citizens Casualty Co. of New York*, 7 N.Y.S.2d 242, 247-48 (1938), *aff'd* 36 N.Y.S.2d 413 (1939).

St. Francis also cites *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093, *reh. denied* 187 Kan. 186, 354 P.2d 670 (1960), and *Nicholson v. Hospital Association*, 97 Kan. 480, 155 Pac. 920 (1916). In *Natanson*, plaintiff alleged injuries due to her exposure to an excessive amount of radiation during treatment with radio-active cobalt. St. Francis was a defendant along with Dr. Kline. The court stated:

"There is no issue presented by the record as to the relationship between Dr. Kline and the St. Francis Hospital. The petition pleaded that the defendants were engaged in a joint adventure or in the alternative that the defendant physician was acting within the scope of his employment as agent, servant and employee of the defendant hospital. The answer of the defendant hospital admitted that the defendant physician 'was in charge of its radiology department.' " 186 Kan. at 397-98.

Darter, a physicist who was on staff with the hospital, calculated the radiation dosage. This court concluded that it was reversible error for the district court to refuse to give the following instruction, which had been requested by Natanson:

" 'You are instructed that under the terms of the contract between defendant Kline and defendant Hospital it was the duty of defendant Kline to supervise the work of all the personnel in the radiology department. If you find that plaintiff's injury was the result of the negligence of personnel in the department your verdict shall be in favor of plaintiff and against both defendants.' " 186 Kan. at 411.

The court quoted the following principles with regard to Kline and the hospital being chargeable with Darter's negligence:

" 'A physician is responsible for an injury done to a patient through the want of proper skill and care in his assistant, and through the want of proper skill and care in his apprentice, agent, or employee. The fact that a physician's assistant is a member of the same or a similar profession does not

make the rule of *respondeat superior* inapplicable, and a physician is liable not only for negligence of laymen employed by him, but also for the negligence of nurses or other physicians in his employ.

. . . .

" 'Corporations, or persons other than physicians, who treat patients for hire with the expectation of profit are liable for negligence or malpractice on the part of the physicians or nurses employed by them.' (70 C.J.S., Physicians and Surgeons, § 54e, pp. 978, 979, and see cases cited therein.)" 186 Kan. at 411-12.

St. Francis suggests that if it were unlawful for a hospital to employ a physician, the court would not have quoted this passage from Corpus Juris Secundum.

An *amicus curiae* brief filed by VHA Mid America, Inc., (VHA) an organization of nonprofit hospitals, urges this court to accept the distinction drawn by the district court between the corporate practice of medicine by profit and nonprofit health care providers. VHA quotes the following paragraph from 61 Am. Jur. 2d, Physicians, Surgeons, and Other Healers § 155, p. 287, in support of its position:

"Although an unlicensed person or entity may not ordinarily engage indirectly in the practice of a healing art by employing a licensed practitioner to perform professional services for those for whom such person or entity engages to perform such services, one licensed practitioner may employ another for the performance of professional services. And a physician may be employed on a salary basis in an employer's employees' clinic or *by a nonprofit corporation organized as a health and medical service*." (Emphasis added.)

The treatise cites as authority for the emphasized portion the 1938 California case, *People v. Pacific Health Corp.*, 12 Cal. 2d 156. See 61 Am. Jur. 2d, Physicians, Surgeons, and Other Healers § 155, p. 287 n.31.

The authorities cited by VHA are not limited to those involving nonprofit corporations. For instance, VHA brings to the court's attention Article 4 of Chapter 65 of the Kansas Statutes Annotated, K.S.A. 65-406 through K.S.A. 65-474. It deals with hospitals and other facilities in the context of public health. K.S.A. 65-442(b) provides:

"There shall be no liability on the part of and no action for damages shall arise against any licensed medical care facility because of the rendering of or failure to render professional services within such medical care facility

by a person licensed to practice medicine and surgery if such person is not *an employee or agent of such medical care facility*." (Emphasis added.)

VHA would have this court infer from the statute that the legislature has sanctioned hospitals' employing physicians. VHA argues that if this were not true, the emphasized words would be surplusage, and "[a] construction which renders part of a legislative act surplusage is to be avoided if reasonably possible." *State v. Adee*, 241 Kan. 825, 829, 740 P.2d 611 (1987).

In *State ex inf. v. Lewin*, 128 Mo. App. 149, 106 S.W. 581 (1907), the Missouri court considered an attempt to rescind the corporate status of Lewin Hernia Cure Company for engaging in the practice of medicine without a license. The court decided that rather than the corporation's engaging in the practice of medicine, it was in the business of contracting for the practice of medicine. In reaching this conclusion, the court reasoned:

"In all the larger cities, and connected with most of the medical colleges in the country, hospitals are maintained by private corporations, incorporated for the purpose of furnishing medical and surgical treatment to the sick and wounded. These corporations do not practice medicine but they receive patients and employ physicians and surgeons to give them treatment. No one has ever charged that these corporations were practicing medicine. The respondents are chartered to do, in the main, what these hospitals are doing every day, that is, contracting with persons for medical treatment and contracting with physicians to furnish treatment . . ." 128 Mo. App. at 155-56.

In other words, the corporation had the right to practice medicine through its licensed employee, Dr. Lewin.

In *Tarry v. Johnston*, 114 Neb. 496, 208 N.W. 615 (1926), the heirs of Dr. Tarry sued to enforce a contract between them and Dr. Johnston for the sale of Dr. Tarry's business and property. In concluding that the contract was enforceable in equity, the court considered the purchase price:

"The purchase price was not merely $40,000. In addition, plaintiffs were entitled to 10 percent of the net profits for five years from the date of the sale. This was not unreasonable in view of the earning capacity of the sanitarium with its established business, advertising and good will. The owners of hospitals and sanitariums may legally employ physicians and surgeons to perform professional services therein. Both before and after the death of Tarry, Johnston had managed, or assisted in managing, the business for a percentage of the profits. . . . There was no attempt to take Johnston's professional life as security for the purchase price, a charge made by de-

fendants in an earnest argument. The parties to the contract agreed that plaintiffs should retain title while obligations of Johnston remained unperformed. The agreement was reasonable and was one which could lawfully be made." 114 Neb. at 501.

VHA cites *Rush v. City of St. Petersburg*, 205 So. 2d 11 (Fla. Dist. App. 1967), and *Albany Med. Coll. v. McShane*, 104 App. Div. 2d 119, 481 N.Y.S.2d 917 (1984), as cases depending on interpretation of state statutes. The New York Supreme Court in *McShane* determined that pursuant to statutes governing clinical programs in medical schools, a state-chartered medical school may share in the fees from patient care generated by physicians who are faculty members, and the medical and financial records pertaining to such patients belong to the school. In so holding, the court said:

"As far back as the year 1908, the Court of Appeals held the statutory prohibitions against the practice of medicine without lawful registration, or by any person not a registered physician, were not intended to apply and could not reasonably be held to apply to hospitals, dispensaries and similar corporate institutions, which by the express provisions of other statutes and their corporate charters were authorized to carry on the practice of medicine (*People v. Woodbury Dermatological Inst.*, 192 N.Y. 454, 457)." 104 App. Div. 2d at 121.

The Florida case presents circumstances more closely analogous to those in the present case. Dr. Rush sought to represent a class of radiologists in challenging the validity of a contract between Dr. Price, a radiologist, and the city, which owned and operated a hospital, relative to the providing of radiological services at the hospital. Dr. Rush alleged that "the hospital was engaged in the illegal 'corporate practice of medicine.' " 205 So. 2d at 12. In the opinion of the Florida District Court of Appeal, the allegation was groundless because the physician-patient relationship had not been interrupted by the employment arrangement. The court reasoned:

"Did performance of the contract result in unauthorized practice of medicine by the hospital or the City?

"There is no law precisely on point. However, both the plaintiff, Dr. Rush, and defendant, Dr. Price, cite two related opinions of the Attorney General (1955 Op.Atty.Gen., 055-71 and 1956 Op.Atty.Gen., 056-322). While neither of these two possibly conflicting opinions is controlling upon this court, we feel the better reasoned view is found in 056-322, where, in discussing a similar arrangement for radiology services in a County hospital,

it was stated: '. . . the department of radiology is an incident to the proper operation of the hospital . . .' and further: 'it also appears that the relationship of patient and physician is maintained by the medical staff of the department. . . .' The crux of the matter then is whether the relationship between Dr. Price and the patients of Mound Park Hospital has been so destroyed as to allow the hospital to become the medical practitioner.

"In *Watson v. Centro Espanol De Tampa,* 1947, 158 Fla. 796, 30 So. 2d 288, a case involving alleged unauthorized practice of medicine by an intern in a hospital, we find the following:

'The test of whether or not one is practicing medicine within the meaning of Section 458.13, is whether or not he holds himself out as being able to "diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition or who shall offer or undertake by any means or method to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition.' "

"Although *Watson v. Centro Espanol De Tampa* concerned an individual rather than a corporate entity, there is no reason to deviate from the salutary rule laid down. Applying this 'test' it is plain that Mound Park Hospital was not engaged in the unauthorized practice of medicine." 205 So. 2d at 14.

The court concluded:

"In the absence of proof, or even allegation, that no physician-patient relationship existed between Dr. Price and the individuals treated by him, we are impelled to conclude that the contested contract is of a purely fiscal nature. However, it may also be said that the economic arrangement facilitates the discharge of the duties of the respective parties, *i.e.,* the obligation of the City to the citizens of St. Petersburg and the obligation of Dr. Price to relieve suffering." 205 So. 2d at 15.

The Iowa Medical Society states that the purpose of the ban on corporate medicine is to protect the physician/patient relationship from interference by a "corporation owned and managed by lay persons. The goal of any such corporation—to make profits for its investors/shareholders—may conflict with the physician's medical judgment regarding the best interests of the patient." What is not explained is how the exception for certain specialties may be reconciled with the stated purpose for the ban. It may be noted that the Iowa Medical Society opposes any changes in existing law, which includes the exception for hospitals employing pathologists and radiologists. In this regard, VHA advocates that a prohibition on hospital employment of physicians may adversely affect the availability of emergency and specialty services.

With regard to public policy, VHA argues that under the Kansas Hospital Licensing statutes, K.S.A. 65-425 *et seq.*, the Kansas Department of Health and Environment is charged with ensuring that hospitals provide quality medical care. VHA argues that the regulatory scheme eliminates the concerns which the corporate practice of medicine prohibition was devised to quell. VHA would have this court conclude, therefore, that the rule is no longer necessary.

There is some precedent in this court's opinions for relying on a regulatory agency to ensure a regulated entity's compliance with its public purposes. In *Board of Johnson County Comm'rs v. Ev. Luth. Good Samaritan Soc.*, 236 Kan. 617, 694 P.2d 455 (1985), the court concluded that a building of apartments which were rented to elderly and handicapped persons was entitled to exemption from ad valorem taxation under K.S.A. 79-201b *Fourth*. The court stated:

"The legislature in enacting K.S.A. 79-201b *Fourth* obviously relied upon federal regulations to assure the goals and public purposes of the program designed to provide adequate housing for low income elderly and handicapped persons have been and continue to be met. The presence of the four elderly residents in Olathe Towers not receiving rent subsidies is a matter between applicant, as operator of the facility, and HUD." 236 Kan. at 624-25.

The introduction to the brief of *amicus curiae* Kansas Hospital Association (KHA) is a particularly well-formulated position statement and merits being quoted:

"In 1924, this Court first enunciated the so-called prohibition on the corporate practice of a profession. Whatever its merits in other contexts, no case has ever suggested that it prohibited hospitals from employing physicians to provide patient care. Hospitals employed physicians at the time of that decision and have continued to do so in the intervening decades. The arguments being advanced by Dr. Weiss, if adopted by this Court, would be disruptive to the provision of health care and to legitimate relationships between Kansas hospitals and physicians."

In support of its assertion that hospitals employed physicians at the time of the *Winslow v. Board of Dental Examiners*, 115 Kan. 450, decision, KHA calls the court's attention to *Nicholson v. Hospital Association*, 97 Kan. 480, Syl. ¶ 1, where it was stated: "Charitable associations conducting hospitals are not liable for the negligence of their physicians and attendants resulting in

injury to patients unless it is shown that the association maintaining the hospital has not exercised reasonable care in the employment of its physicians and attendants." In this regard, we note that in the recent case of *McVay v. Rich*, 18 Kan. App. 2d 746, Syl. ¶ 1, 859 P.2d 399 (1993), the Court of Appeals held:

"Under the provisions of K.S.A. 65-442(b) and K.S.A. 1992 Supp. 40-3403(h), a licensed hospital cannot be held liable for damages because of the rendering of or failure to render professional services within the hospital by a physician who *is licensed to practice medicine and surgery and covered* under the Health Care Stabilization Fund, *if the physician is not an employee or agent of the hospital.*" (Emphasis added.)

In addition to the Kansas statutes cited by other advocates as support for the proposition that the legislature recognizes and permits employment relationships to exist between physicians and hospitals, KHA cites statutes providing for hospital liens, staff recruitment, and expansion of the definition of "hospital." K.S.A. 65-406 states in pertinent part:

"Every hospital in the state of Kansas, which shall furnish emergency, medical or other service to any patient injured by reason of an accident ... shall, if such injured party shall assert or maintain a claim against another for damages on account of such injuries, have a lien not to exceed five thousand dollars ($5,000) upon that . . . recovery . . . ."

As one commentator has stated:

"In public and community hospitals we believe there is no danger of lay interference with the professional aspects of medical practice, in the sense of interference in the diagnosis of a patient's ailment, in the decision upon a course of treatment, or in the carrying out of that decision. . . .

". . . The *raison d'etre* of these hospitals is service to the patient; they were built by the public for that very purpose; their management either is public or is volunteered by civic-minded persons; they stand at the center of our whole system of medical care for the people of the Nation. Division of loyalty is not threatened, whatever the arrangements with the physician, for the loyalty of both parties is to the patient. Lay interposition in the doctor-patient relationship would be as repugnant to hospital management as it would be to the profession." Willcox, *Hospitals and the Corporate Practice of Medicine*, 45 Cornell L.Q. 432, 445-46 (1960).

K.S.A. 65-427 requires Kansas hospitals to be licensed by the Department of Health and Environment. The 65-427 requirement applies to medical care facilities, which are defined in K.S.A. 1993 Supp. 65-425(h) as "a hospital, ambulatory surgical center or recuperation center."

A hospital is defined in K.S.A. 1993 Supp. 65-425:

"(a) 'General hospital' means an establishment with an organized medical staff of physicians; with permanent facilities that include inpatient beds; and with medical services, including physician services, and ·continuous registered professional nursing services for not less than 24 hours of every day, to provide *diagnosis and treatment for patients who have a variety of medical conditions*.

"(b) 'Special hospital' means an establishment with an organized medical staff of physicians; with permanent facilities that include inpatient beds; and with medical services, including physician services, and continuous registered professional nursing services for not less than 24 hours of every day, to provide *diagnosis and treatment for patients who have specified medical conditions*." (Emphasis added.)

K.S.A. 65-431(a) provides:

"The licensing agency shall adopt, amend, promulgate and enforce such rules and regulations and standards with respect to the different types of medical care facilities to be licensed hereunder as may be designed to further the accomplishment of the purposes of this law in promoting safe and adequate treatment of individuals in medical care facilities in the interest of public health, safety and welfare."

By definition, to be licensed in Kansas, a hospital must provide "physician services," "provide diagnosis and treatment for patents who have a variety of medical conditions," or who have "specified medical conditions." This is true for hospitals organized for profit or not for profit. It would be incongruous to conclude that the legislature intended a hospital to accomplish what it is licensed to do without utilizing physicians as independent contractors or employees.

As previously indicated, the legislature by statute and this court by decision have acknowledged what is and has been a reality for decades—hospitals employ physicians. Without physicians, nurses, and medical technicians, a hospital cannot achieve that for which it is created and licensed—to treat the sick and injured. To conclude that a hospital must do so without employing physicians is not only illogical but ignores reality.

As previously noted, in *Early Detection Center, Inc. v. Wilson*, 248 Kan. 869, 811 P.2d 860 (1991), we relied upon the cases of *Winslow, Goldman,* and *Zale.* The basic rationale for those decisions was that to permit a corporation to practice a licensed profession would be injurious to the public welfare. Such a pro-

hibition was necessary to protect the public health. In *Winslow*, we said:

"Dentistry is a profession having to do with public health, and so is subject to regulation by the state: The purpose of regulation is to protect the public from ignorance, unskillfulness, unscrupulousness, deception, and fraud. To that end the state requires that the relation of the dental practitioner to his patients and patrons must be personal." 115 Kan. at 451-52.

In *Goldman*, we said:

"It is our judgment that under our statutes, the legislature, having in mind the protection of eyesight is just as important as the protection of property rights and advice thereon, as the protection of the teeth, as the protection against improper and unauthorized methods of healing, by the enactment of the statutes with reference to optometry recognized it as a profession and accordingly regulated it." 142 Kan. at 890.

None of these early cases dealt with a hospital's employing a physician nor prohibited such employment. None of these cases dealt with a corporation in the business of providing health care to the general public. We agree that *Early Detection Center* should not be extended beyond its facts and is distinguishable from the present case. Here, the corporation employing the physician is a hospital licensed by the State of Kansas as a medical care facility and a health care provider. This difference is crucial to our determination and it distinguishes a hospital from a "diagnostic clinic," which was involved in *Early Detection Center.*

In light of the above, we conclude that neither Kansas case law nor statutory law prohibits a licensed hospital from contracting for the services of a physician. Such contracts are not contrary to the interest of public health, safety, and welfare and, therefore, are legally enforceable. We find no valid reason to distinguish between profit and nonprofit hospitals in this regard. The judgment of the district court, although based on this erroneous distinction, nevertheless reached the correct result. In such a case, the district court's decision will be upheld. *Admire Bank & Trust v. City of Emporia*, 250 Kan. 688, 829 P.2d 578 (1992).

Dr. Weiss next contends that the compensation under the employment agreement constitutes an illegal "kickback" in violation of 42 U.S.C. § 1320a-7b(b) (1988 and Supp. III 1991). 42 U.S.C. § 1320a-7b establishes criminal penalties for certain conduct involving Medicare. It often is referred to as the Medicare anti-

kickback provision. St. Francis argues that the court should not consider this issue because it was not raised in the district court. This court has stated many times: "It is a well recognized concept of appellate procedure that a point not raised before the trial court may not be raised for the first time on appeal." *Lostutter v. Estate of Larkin*, 235 Kan. 154, 166, 679 P.2d 181 (1984). In the present case, the issue was raised but not decided, unless by default, in the district court.

It was the second ground upon which Dr. Weiss moved for summary judgment. At the hearing on his motion, however, counsel withdrew the issue from consideration, stating that questions of fact remained with regard to whether the Weiss/St. Francis relationship was an employee/employer relationship which was exempted from 42 U.S.C. § 1320a-7b(b). Dr. Weiss' counsel stated that the evidence would need to be developed at trial. In a motion in limine, St. Francis requested that any evidence related to Dr. Weiss' theory of anti-kickback violation be heard outside the presence of the jury. Dr. Weiss' counsel agreed that would be the proper procedure. The district court granted St. Francis' request.

On appeal, Dr. Weiss concluded the statement of facts in his brief with the following: "Notwithstanding the establishment of these facts at trial, the court refused to grant Weiss' renewed motions for summary judgment." He gives no citation to the record. St. Francis states: "[C]ontrary to Weiss's assertion . . . , he never 'renewed' any portion of his motion for summary judgment." St. Francis further asserts that Dr. Weiss failed to present any evidence relevant to his kickback theory and "never asked the district court to rule that St. Francis's agreement with Weiss violated the Social Security anti-kickback statute or regulations." Dr. Weiss did not file a reply brief on the main appeal (his second brief is addressed exclusively to the issues on the cross-appeal), and St. Francis' assertions have gone unanswered. Thus, as far as this court has been informed, Dr. Weiss technically raised the issue, but by his subsequent conduct he removed it from the district court's consideration. The issue, therefore, has not been raised so as to comply with the requirement for consideration on appeal. Moreover, if resolution of the issue by the district court required development of facts which never became

the subject of evidence, it would follow that this court's consideration of the issue will be hampered by the same deficiency.

Dr. Weiss next contends that the district court erred in excluding from evidence an unexecuted employment agreement form. This court has made the following statement of the standard of review: "Rulings on admissibility of evidence fall within the sound discretion of the trial court. Thus, one attacking evidentiary rulings must show abuse of discretion. An abuse of discretion exists only when no reasonable person would take the view adopted by the trial court." *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, Syl. ¶ 9, 822 P.2d 617 (1991).

Dr. Weiss complains of the district court's refusal to admit into evidence "a new agreement," which he asserts was submitted to him by St. Francis in 1990. The document, which was marked as Defendant's Exhibit K, does not seem to be a part of the record. In his brief, Dr. Weiss asserts that the "new agreement" "omitted the liquidated damages provisions," but he does not refer to anything in the record which substantiates his assertion.

At trial during Dr. Weiss' testimony, counsel for St. Francis objected to questions about the "new agreement." The district court sustained the objection and suggested to Dr. Weiss' counsel: "You need to lay a foundation if it was executed. It wasn't executed, I'm going to continue to sustain the objection." Dr. Weiss' counsel responded that he would make a proffer, and he did.

St. Francis argues that the matter is not properly before the court due to Dr. Weiss' failure to make a written proffer. The real problem, however, is simply that the document is not a part of the record on appeal. Dr. Weiss would have this court base a reversal of St. Francis' recovery of liquidated damages on his assertion that there was no liquidated damages provision in the "new agreement." Moreover, he would have this court conclude that the "new agreement" was relevant and, therefore, erroneously excluded because it modified the employment agreement, even though the "new agreement" was never executed by the parties. Dr. Weiss has not furnished this court with a sufficient record necessary for the ruling he seeks.

We now turn to St. Francis' cross-appeal. St. Francis first complains that Dr. Weiss should not have been permitted to take inconsistent positions with respect to the enforceability of the

employment agreement. St. Francis argues that Dr. Weiss should not have been permitted to defend against its claim for liquidated damages under the agreement on the ground that it was unenforceable and also to counterclaim for unpaid vacation and salary under the agreement. The district court action of which St. Francis complains is its permitting Dr. Weiss to pursue his counterclaim. St. Francis raised the issue in its motion for directed verdict.

St. Francis bases its argument on the doctrine of election of remedies. St. Francis cites cases from the 1940's for general propositions concerning election and inconsistent positions. Its citation of several more recent cases indicates that the hospital is not unaware of modification of the doctrine since Kansas' adoption of the code of civil procedure in 1963.

K.S.A. 1993 Supp. 60-208(e)(2) states in pertinent part: "A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal or on equitable grounds or on both." In accordance with this rule of pleading, Dr. Weiss answered St. Francis' petition by asserting the unenforceability of the agreement "pursuant to K.S.A. [1993 Supp.] 17-2708 and upon authority of the Kansas Supreme Court as articulated in *Early Detection Center, Inc. v. Wilson*" and counterclaiming for benefits lost due to the hospital's breach of the agreement.

In December 1991, the district court denied Dr. Weiss' motion for summary judgment and stated in its journal entry "that the Employment Agreement at issue in this case at bar is valid and enforceable." When the matter was tried to a jury in August 1992, therefore, it was long since settled that for purposes of the proceeding, the agreement was enforceable as a matter of law. Unenforceability of the agreement was no longer an alternative theory available to Dr. Weiss. In these circumstances, the doctrine of election of remedies, even in its current vestigial form, would have no application. We find no merit in St. Francis' argument.

We next consider if Dr. Weiss' repudiation of the employment agreement relieves St. Francis of the obligation to pay his unpaid vacation and unpaid salary. St. Francis contends that the district court should not have submitted Dr. Weiss' counterclaim to the

jury because, as a matter of law, his repudiation of the contract "relieved St. Francis of any obligation to perform." Dr. Weiss responds that St. Francis' obligation to pay compensation earned by him before he terminated employment was unaffected.

St. Francis relies on *In re Estate of Moe*, 240 Kan. 242, Syl. ¶ 1, 729 P.2d 447 (1986), which states: "General contract law provides that once performance has begun and prevention of further performance takes place by repudiation or otherwise, there is an actual breach and further performance is excused." St. Francis would have the court equate "further performance," as used in this syllabus paragraph, with the unpaid vacation and unpaid salary which Dr. Weiss claimed had accrued to him before he terminated his employment with the hospital.

Ida Turner worked as Moe's housekeeper for years on the strength of his promise to leave property to her. When Moe died intestate, Turner filed a claim against his estate. 240 Kan. at 243-44. Because Turner had performed under the contract, she was entitled to what had been promised to her. 240 Kan. at 248. The question in the case was whether the statute of limitations for a claim under an oral contract had run before Turner made her claim against his estate. Moe's son, administrator of the estate, contended that the limitations period began to run in 1980 when Moe sold some of the property which had been promised to Turner. 240 Kan. at 245. The court concluded that the limitations period did not begin to run until Moe's death in 1983, the completion of the contract. 240 Kan. at 248. The court stated that its holding in *Moe* represented an exception to the general rule which it had stated in Syl. ¶ 1, the rule invoked by St. Francis. 240 Kan. at 245.

In the circumstances of *Moe*, the repudiation was Moe's selling some of the promised property. Under the general rule, Turner would have been excused from continuing to perform her housekeeping services for Moe when he sold the property. Accordingly, the time in which she could have sued for breach would have commenced running immediately. Under the exception, Turner could continue performing her housekeeping services for Moe until he died and then claim what had been promised to her.

Pursuant to the rule, St. Francis exercised its option to treat the contract as breached, and it sued Dr. Weiss to enforce the

liquidated damages provision. What St. Francis is arguing, though, is that Dr. Weiss' termination gave it the additional right to withhold compensation which had accrued to him before the termination. The hospital has cited no authority for its contention.

Along with its repudiation argument, St. Francis presents what seems to be a completely separate theory why Dr. Weiss' counterclaim should not have been submitted to the jury. The hospital contends that the contract provision for 180-day notice before termination was a condition precedent to his receiving any benefits upon termination. St. Francis cites *Sweet v. Stormont-Vail Regional Medical Center*, 231 Kan. 604, 647 P.2d 1274 (1982).

Theresa Sweet terminated her employment with Stormont-Vail without giving any prior notice. It was undisputed that the employee handbook was considered a part of the employment contract. The handbook provided: " 'Any unused accumulated vacation that does not exceed 1½ times an employee's annual vacation benefit will be paid to an employee who resigns *and gives the proper notice.*' (Emphasis added.)" 231 Kan. at 606. Stormont-Vail paid her for her work to the date of termination but refused to pay for accumulated vacation time. This court upheld the hospital's action.

In the present case, St. Francis has not brought to the court's attention any provision of the employment contract which is comparable to the one in *Sweet* which made receiving accumulated vacation benefits dependent on proper notice of termination. *Sweet* is not authority for making receiving accrued vacation pay dependent on giving proper notice in the absence of some express contractual link between the two.

Next, we consider if there was evidence to support Dr. Weiss' counterclaim for unpaid vacation and unpaid salary. The journal entry of judgment on jury verdict indicates that the parties stipulated to the amounts, but not the validity, of Dr. Weiss' claims for unpaid vacation and unpaid salary. They stipulated that the vacation amount was $8,269.23 and that the salary amount was $969.23. Judgment was entered in favor of Dr. Weiss, as a setoff, in the amount of $9,238.46.

St. Francis first contends that there was no evidence to support Dr. Weiss' claim for unpaid vacation. St. Francis states that the contract contains no provision for the accrual or accumulation of vacation pay. The agreement contains only the following reference

to vacation: "Physician is entitled to four weeks paid vacation per year."

It is St. Francis' contention that in the absence of some provision for accumulation, it has no obligation to compensate an employee for unused vacation time. For this proposition, St. Francis relies on *Sweet*. There, the court stated: "There is no inherent right to a vacation or to payment for unused vacation time and the rights thereto, if any, must be found in the employment contract." 231 Kan. at 611.

Dr. Weiss did not respond to St. Francis' argument on this issue. St. Francis makes a persuasive argument that absent a contract provision, there is no right to payment for unused vacation time. Dr. Weiss has not directed the court's attention to a contract provision which would support his claim; nor has our review of the contract disclosed one. We find no support for the district court's allowance of accrued vacation pay.

Next, St. Francis contends that there was no evidence to support Dr. Weiss' claim for unpaid salary because Dr. Weiss did not accept the salary increase which was offered to him in April 1991. St. Francis states that rather than accepting the increase, Dr. Weiss "rejected it as 'a slap in the face.' "

After meeting with Dr. Weiss in April 1991 "regarding his review and salary evaluation process," Dan Whitney, the administrator of the Snyder Clinic, reported in writing to Mike Mirt, the administrator of St. Francis' Physician Division. The note, which is dated April 9, 1991, states in pertinent part:

"He indicated to me that if there are indeed no financial benefits involved with the volume of his current practice that he would simply scale down his practice to the level of Dr. Nemmers and treat his practice merely as an 8 to 5 job. In talking with him regarding the compensation which he feels is fair, he has indicated that an increase in his current salary to 4030.00 per pay period would satisfy him and keep him at his current aggressive practice building status. He said that he felt he was worth more than this but would be appeased by that increase. Please advise me regarding your thoughts on this and how to proceed."

In a memorandum dated April 12, 1991, to Dr. Weiss' personnel file, Dan Whitney stated:

"I met briefly with Dr. Weiss to inform him that I had presented his concerns and contentions to Mike Mirt regarding his salary and review process. I indicated again that Mike was willing to adjust his salary to

$85,863.00 annually from his current salary of $83,990.00. This increase would reflect the recent growth in his practice. Dr. Weiss indicated to me that his initial concerns were still present and that this increase was not adequate. . . . I indicated that further negotiations should be pursued between Mike and him directly and ended the conversation with that as the next step for him to proceed with to rectify these differences."

At trial, Whitney testified that Dr. Weiss considered the proposed increase to be "a slap in the face."

In his letter of June 6, 1991, which notified St. Francis of his termination, Dr. Weiss wrote: "[T]he resultant salary increase to $85,862.57 promised by Dan Whitney, the MOD Manager, has not been reflected in my paycheck. This is not the·first time that an error in my salary or benefits has occurred, but is part of a pattern that has occurred for some time." On June 18, Bruce Carmichael, a vice-president of St. Francis, wrote to Dr. Weiss in response to his termination notice. With regard to the salary increase, Carmichael stated:

"Your letter of June 6, 1991, mentions you did not receive a salary increase as 'promised by Dan Whitney.' It was my understanding you refused the increase offered to you, but if you are now stating this is a default in the Agreement and you will accept the salary increase, please let me know."

We do not find in the record any response by Dr. Weiss. His resignation became effective July 10, 1991.

The evidence with regard to the unpaid salary is that St. Francis informed Dr. Weiss that it would increase his salary a certain amount and that he responded by demanding more. St. Francis argues that the salary increase could only be effected by a contract which is separate from the employment agreement. St. Francis argues that it offered the salary increase, but Dr. Weiss did not accept it, and, therefore, it never took effect.

The salary increase does not require a separate agreement, since the process for a performance review and a commensurate salary adjustment was established in the employment agreement, and St. Francis' proposing an increase should be regarded as the hospital's adjusting Dr. Weiss' salary to reflect his worth. Thus, the logical conclusion would be that Dr. Weiss was entitled to the increase proposed by the hospital even though he contended that it should have been greater. The supporting provision of the employment agreement states:

"Medical Center shall pay Physician an annual base salary, the initial amount of which shall be $52,000.00. The annual base salary may be increased or decreased by Medical Center prospectively on a semi-annual basis effective as of January 1st and July 1st of each year, *based on a regularly-conducted, performance review.*" (Emphasis added.)

We find no error in the district court's granting Dr. Weiss' claim for unpaid salary.

St. Francis, in its final issue, contends that the district court erred in denying its request for prejudgment interest of 10% per year on the amount of the liquidated damages from July 10, 1991. St. Francis does not specify when the period for prejudgment interest would end, but it may be assumed that it would be August 25, 1992, when the journal entry of judgment on jury verdict was filed. St. Francis states that K.S.A. 16-201 is the statutory basis for prejudgment interest. The statute provides in pertinent part as follows: "Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due."

Two days after the filing of the journal entry of judgment on the jury verdict, St. Francis filed a motion seeking an order which would amend the judgment in its favor "to include prejudgment interest on the liquidated damages, at the rate of ten percent (10%) per annum from July 10, 1991, as provided in K.S.A. 16-201." In a journal entry filed on September 17, 1991, the district court denied the motion.

Dr. Weiss argues that because St. Francis did not make its claim for prejudgment interest a part of the pretrial conference order, it was precluded from asserting it later. St. Francis responds that there is no requirement in either K.S.A. 1993 Supp. 60-216 or Supreme Court Rule 140 (1993 Kan. Ct. R. Annot. 131) that a claim for prejudgment interest be specified in the pretrial conference order. K.S.A. 1993 Supp. 60-216 authorizes the pretrial conference and provides:

"The court in its discretion may, and shall upon the request of either party make an order which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel; and

such order when entered controls the subsequent course of action, unless modified at the trial to prevent manifest injustice."

Supreme Court Rule 140 establishes the procedural steps to be followed in a pretrial conference. Subsection (g)(12) states that "questions of law will be stated and the court will rule thereon." (1993 Kan. Ct. R. Annot. at 132). St. Francis contends that prejudgment interest is incidental to the judgment rather than a separate claim or theory of recovery. We agree.

It seems apparent from the statute and the rule that at least one principal purpose of a pretrial conference is the identification and simplification of issues before trial so that the trial proceedings may be as swift and efficient as due process permits. To this end, all issues which might consume trial time should be raised at the pretrial conference. In keeping with the purpose, however, it would not seem necessary to require pretrial presentation of issues unless their early consideration would contribute to streamlining the trial, and it would not make sense to foreclose their being raised later. The question of prejudgment interest is not an issue which would occupy trial time and, therefore, would not require pretrial identification.

St. Francis relies on *Royal College Shop v. Northern Ins. Co. of N.Y.*, 895 F.2d 670, 673-74 (10th Cir. 1990) (applying Kansas law), for the proposition that the district court has no discretion to withhold an award of prejudgment interest when a claim is liquidated. The federal court quoted *In re Tax Protests of Midland Industries, Inc.*, 237 Kan. 867, 868, 703 P.2d 840 (1985), as follows: " 'Where an amount is due upon contract, either expressed or implied, and there is no uncertainty as to the amount which is due or the date on which it becomes due, the creditor is entitled to recover interest from the due date.' " 895 F.2d at 674.

In the present case, the employment agreement expressly required the physician to pay a set amount to St. Francis upon termination due to the physician's breach. The district court, therefore, should have awarded prejudgment interest on the liquidated amount.

We hold that (1) the denial of summary judgment based upon the finding that St. Francis may enter into, and enforce, an employment contract with a physician is affirmed; (2) the judg-

ment entered granting a setoff for unpaid vacation in the amount of $8,269.23 must be reversed; (3) the judgment granted as a setoff for salary in the amount of $969.23 is affirmed; and (4) the denial of prejudgment interest for the liquidated damages must be reversed.

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded for the entry of judgment in accordance with this opinion.

MCFARLAND, J., not participating.