NOT DESIGNATED FOR PUBLICATION

No. 121,470

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

PRELLWITZ CONSTRUCTION, INC.,
*Appellee*,

v.

NIGEL JONES, KYLE CHANSLER, and DONALD KIMBALL,
*Appellants*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; TERESA L. WATSON, judge. Opinion filed July 2, 2020. Affirmed.

*Trevor C. Wohlford* and *Will B. Wohlford*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Topeka, for appellants.

*Bryan W. Smith*, of Smith Law Firm, of Topeka, for appellee.

Before ARNOLD-BURGER, C.J., WARNER, J., and LAHEY, S.J.

PER CURIAM: Kyle Chansler, Nigel Jones, and Donald Kimball (the Owners) appeal from the judgment in a lawsuit brought against them by the general contractor, Prellwitz Construction, Inc. (PCI), hired to build their home. Following a bench trial, the district court found for the general contractor on its breach of contract claim and on the Owners' counterclaims, including a claim under the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 et seq. The Owners argue the district court erred by (1) not ordering the general contractor to bear the costs of defending a lien foreclosure claim a

1

subcontractor brought; (2) holding the Owners breached the contract; and (3) holding the Owners failed to prove their KCPA claims. Finding no error by the district court, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 2013, the Owners bought land in Shawnee County, intending to build a home there. Jones, who is an architect, designed the home and drew up plans with input from Chansler and Kimball. In July 2016, the Owners began meeting with George Coe, project manager for PCI, which is owned by general contractor Mark Prellwitz.

Coe provided an initial bid proposal to the Owners that included a list of allowances, which Coe said were "realistic or perhaps strong" estimates of costs for certain items or work required for construction of the home. The allowance for excavation costs was $10,000, but the parties later agreed to increase it to $12,500 based on additional work the Owners desired. The proposal required an initial payment of $55,000 due upon signing of the contract, with monthly draws after excavation began. Neither the proposal nor the eventual contract included a provision detailing the use of the $55,000 payment or requiring PCI to provide the Owners with an accounting of its use.

Prellwitz, Chansler, and Kimball signed the contract on September 29, 2016; Jones signed on October 5, 2016, and gave Prellwitz a check for $55,000. Prellwitz took the $55,000 payment, wrote himself a check for $25,000, wrote Coe a check for $25,000, and left $5,000 in the business account. The contract stated:

"The Owner shall pay the Contractor for the performance of the Contract, but subject to any additions or deductions provided by the parties, the sum of $529,558.00 which includes allowances, listed in Description of Materials, inclusive of the Contractor's fee.

2

> Any Allowance items that go above the listed allowance will be paid to Builder. Any underages that may result in any allowance category will be refunded to Owner and will be documented by attached invoices."

The contract included several allowances "to pay for items for which the cost is unknown or under control of Owner," and it provided:  "Cost of all changes and any overages of allowances shall be billed to the Owner at cost plus a 15% mark-up."

Construction was delayed while the Owners secured financing, but work began in January 2017. PCI subcontracted with RDR Excavating, Inc. (RDR) for the excavation phase of construction. Riley Rees, the owner of RDR, did not submit a bid before beginning work, nor did PCI ask him for one. PCI did not routinely request nor did Rees routinely provide bids on this type of excavation because there was no way to know what RDR might encounter when it began digging.

The property had a steep driveway from the road to the planned location of the house. The home site was also sloped, so RDR had to excavate a flat area by cutting through vegetation and topsoil to reach native soil that would adequately support the house's foundation. Because the native soil was mostly clay, which expands and contracts depending on moisture, Rees had to bring in select fill to create a pad strong enough to support the house. Wet and cold weather delayed and prolonged the excavation.

A couple of days before RDR finished the pad, Coe visited the job site and spoke with Rees, who told him the fill alone had cost over $20,000. RDR's bill to PCI for the excavation work, reflected on an invoice dated February 17, 2017, totaled $44,044.95. PCI included that amount in its bank draw request to the Owners dated March 6, 2017. Unhappy that the excavation cost was so much more than the allowance amount, the Owners did not pay.

3

On March 24, 2017, RDR filed a mechanic's lien against the property in the amount of $44,044.95. Three days later, the Owners emailed Prellwitz and Coe and said they would pay $25,000 to settle the excavation bill. Two days after that, Coe replied by email, stating RDR was willing to accept $30,000 as payment in full. On April 10, 2017, Kimball responded, stating he would not sign a draw request for $30,000 until he had a signed statement from Riley and Prellwitz acknowledging that the $30,000 would fully settle the invoice and they would seek no further payment.

The next day, Coe told the Owners that Prellwitz would bring a signed document to the bank when he picked up the checks, but the day after that, Kimball emailed Coe and stated he had spoken with Rees, who was reluctant to provide a signed statement. Although Rees was willing to release RDR's lien after he received the money, Kimball told Coe the Owners would not release the $30,000 without a signed and notarized lien release form given to them immediately upon receipt of the funds. The Owners' bank, Capital Federal (CapFed), issued a check to RDR dated April 18, 2017, but Rees did not pick up the check because he was angry about some comments the Owners had made. CapFed voided the check on April 19, 2017.

Meanwhile, PCI continued construction work on the house. PCI's June 7, 2017 request for a bank draw included invoices for $17,200 for windows; $1,572.03 for garage doors; and $1,898.34 for exterior paint. PCI sent the Owners an invoice dated June 28, 2017, that included invoices from Insulation and Drywall Contractors, Inc. in the amount of $43,792, as well as charges for nonpayment for the windows and exterior paint. PCI demanded payment on June 28, 2017, and, when the Owners did not pay, PCI stopped work on the house. The next day, PCI filed a lien against the property in the amount of $25,531.31, which included the 15% overage on the excavation allowance, the cost of the windows and the late fees for nonpayment of that bill, the cost of the garage doors, and the cost of the exterior paint.

4

On July 3, 2017, PCI and RDR filed suit seeking foreclosure of their liens, and PCI sued the Owners for breach of contract and unjust enrichment. On July 19, 2017, PCI filed a second lien against the property in the amount of $47,402.93, which included money owed for the insulation and drywall work, fees for nonpayment of the windows bill, and fees for nonpayment of the exterior paint bill. The Owners eventually paid for the paint and the drywall work.

Around July 20, 2017, Prellwitz sent a letter to each of the Owners' employers, stating he was in a contract dispute with the Owners, who owed him money. Prellwitz asserted that the Owners' "lack of professionalism reflects poorly on them and also poorly on the institutions that employ them." He concluded each letter by stating: "I am quite certain this type of behavior would be considered conduct unbecoming." Kimball was a sergeant in the Wichita Police Department, Chansler was a lieutenant colonel in the Kansas Army National Guard, and Jones was an architecture professor and building project manager at Oklahoma State University.

On August 18, 2017, the Owners filed their answer and brought counterclaims against PCI and RDR. Many details of the litigation in the district court are not relevant to the issues now on appeal. For example, PCI and RDR first named the Owners and CapFed as defendants, but the parties later stipulated to dismissing CapFed from the suit. The district court also dismissed RDR from the case and granted partial summary judgment in the Owners' favor on RDR and PCI's lien foreclosure claims. Neither CapFed nor RDR is a party to this appeal, nor do the issues on appeal involve them. Similarly, the claims and counterclaims changed multiple times, but that evolution is not relevant to the issues on appeal.

Suffice it to say that going into trial, PCI was the only remaining plaintiff and counterclaim-defendant, and it brought (1) a claim of breach of contract based on the Owners' failure to pay the excavation costs and the related 15% mark-up, the window

costs, and the garage door costs; and (2) a claim for unjust enrichment. As the remaining defendants, the Owners brought counterclaims alleging breach of contract, unjust enrichment, breach of the duty of good faith and fair dealing, breach of express and implied warranties, slander of title, and violations of the KCPA.

The four-day bench trial began on April 30, 2019. Due to the limited nature of this appeal when compared to the many trial issues, much of the testimony and evidentiary exhibits presented are not relevant to this appeal. This opinion therefore details only the relevant evidence; it greatly summarizes the rest and provides additional facts as needed.

Rees testified about RDR's involvement in the construction. He explained the work RDR completed and testified the work billed was for work RDR had done. Another experienced excavator testified he would have bid the excavation at $52,770, and a second experienced excavator testified that, in his opinion, $12,500 was not an unreasonable allowance for the excavation. PCI also presented testimony from other subcontractors who worked on the project, as well as the facility manager for the lumberyard PCI used.

Coe testified at length about his involvement in the negotiating process and his common use of allowances in contracts for items for which he cannot get a fixed price. For example, there are so many types of cabinets that without a specific choice being made, there is no way to determine a set price for the cabinets without the client making a firm choice prior to signing the contract. Coe explained that excavation was an allowance "[b]ecause we don't know what we're going to encounter. . . . [W]hat if we run into other utilities? What if we run into water? It's just because we don't know, it's an unknown."

Coe also testified that he explained to the Owners the $55,000 was their "skin in the game" to balance PCI's risk in placing orders on its own credit for items such as windows without the Owners paying for those items before ordering them. He said that

6

prior to the contract, the Owners never asked for an accounting of the $55,000. Coe described it as "a payment towards the contract price." Similarly, when Prellwitz testified, he said he understood the $55,000 payment was "a deposit that ties us together, they have skin in the game. We bring the knowledge, and the subs, and the materials and they bring money." After Prellwitz testified, PCI rested its case.

Jones, Kimball, and Chansler testified on their own behalf, relating their memories of the negotiating process and the construction. They each testified about meetings before and after they signed the contract during which Coe told them PCI would use the $55,000 payment to bring electricity to the site and order custom-made doors and windows. The Owners also testified they had hired Terravest Custom Homes to finish construction of the house. The owner of Terravest testified about the work it had done. After PCI called Coe as a rebuttal witness on damages, the parties made closing argument and the district court ordered each side to submit proposed findings of fact and conclusions of law.

The district court filed its journal entry of judgment on May 16, 2019. It found in PCI's favor on its breach of contract claim, holding that the Owners had breached the contract by failing to pay for the excavation costs, the 15% mark-up on the amount those costs exceeded the allowance, the windows, and the garage doors. After calculating prejudgment interest, the district court awarded PCI $80,497.92. Because it found for PCI on the breach of contract claim, the district court did not consider PCI's unjust enrichment claim. The district court considered and denied each of the Owners' counterclaims.

The Owners timely appeal.

I.      DID THE DISTRICT COURT ERR BY NOT HOLDING K.S.A. 60-1106 REQUIRED PCI TO BEAR THE COST OF DEFENDING THE OWNERS AGAINST RDR'S CLAIMS?

The Owners argue the district court erred by failing to hold that K.S.A. 60-1106 required PCI to pay the costs of defending against RDR's claim. But as PCI argues, we find the issue is not properly before us.

K.S.A. 60-1106 provides that when an action to foreclose on a mechanic's lien

"is brought by a subcontractor, or person other than the original contractor, such original contractor shall be made a party defendant, and shall at his or her own expense defend against the claim of every subcontractor, or other person claiming a lien under this article, and if he or she fails to make such defense the owner may make the same at the expense of such contractor; and until all such claims, costs and expenses are finally adjudicated, and defeated or satisfied, the owner shall be entitled to retain from the contractor the amount thereof, and such costs and expenses as he or she may be required to pay."

Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 35) mandates that appellants provide "a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on." The Owners cite to their motion to realign parties, the joint pretrial order, and the trial transcript. The Owners did file a motion to realign parties that raised this argument, but they later withdrew the motion "to the extent that it requests that the parties be realigned," and there is no further mention in the record of the motion. The page of the joint pretrial order to which the Owners cite is an itemized list of the damages the Owners sought, which includes the item "Attorney Fees (KCPA; K.S.A. § 60-1106)" in an amount to be determined. And at trial, the Owners briefly included in their closing argument a reference to K.S.A. 60-1106 and its requirement that PCI defend them against RDR's claim and bear the costs.

But the Owners fail to provide a pinpoint citation to the location in the record where the district court ruled on the issue. As a result, the Owners have improperly briefed the issue, and we deem it abandoned. See *Jarvis v. Kansas Dept. of Revenue*, 56 Kan. App. 2d 1081, 1097, 442 P.3d 1054 (citing *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 [2015]), *rev. granted on other grounds* 310 Kan.1062 (2019). Since 2014, the Kansas Supreme Court has warned litigants "that Rule 6.02(a)(5) would, in the future, be strictly enforced." *Godfrey*, 301 Kan. at 1043-44 (citing *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 [2014]). And since 2015, "[w]e are now sufficiently post-*Williams* that litigants have no excuse for noncompliance with Rule 6.02(a)(5)." *Godfrey*, 301 Kan. at 1044.

Moreover, a review of the record in its entirety reveals the district court never ruled on the issue. And although PCI points this out in its appellate brief, the Owners' reply brief states only that PCI's "assertion is plainly inaccurate" and refers for the first time to the posttrial proposed findings of fact and conclusions of law the Owners submitted to the district court, which included a ruling in their favor on the issue. The district court's journal entry of judgment, however, did not even mention K.S.A. 60-1106. "Without a ruling from the district court on this issue, we cannot proceed with formless appellate review." *Manhattan Ice and Cold Storage, Inc. v. City of Manhattan*, 294 Kan. 60, 81, 274 P.3d 609 (2012).

In addition, as the Kansas Supreme Court has repeatedly held, "litigants and their counsel bear the responsibility for objecting to inadequate findings of fact and conclusions of law in order to give the trial court the opportunity to correct such inadequacies, and, when there is no objection, omissions in findings are not considered on appeal." *McIntyre v. State*, 305 Kan. 616, 618, 385 P.3d 930 (2016). The Owners could have filed a motion for amended or additional findings under K.S.A. 2019 Supp. 60-252(b) or otherwise sought a ruling on the issue when the district court's journal entry did not include one. They did not. They "failed to object to the sufficiency of the district

court's findings of fact and conclusions of law, and the objection will not be considered for the first time on appeal." *Seaman U.S.D. No. 345 v. Kansas Comm'n on Human Rights*, 26 Kan. App. 2d 521, 523, 990 P.2d 155, *rev. denied* 268 Kan. 888 (1999).

In summary, the district court did not rule on this issue, the Owners did not ask it to amend its journal entry to do so, and the Owners fail to acknowledge the lack of a ruling on the issue, much less argue why we should resolve the issue for the first time on appeal. Thus, the Owners failed to preserve their K.S.A. 60-1106 argument for appellate review. See *St. Francis Regional Med. Center, Inc. v. Weiss*, 254 Kan. 728, 747, 869 P.2d 606 (1994) (holding issue "raised but not decided, unless by default, in the district court" not properly preserved for review).

II.     DID THE DISTRICT COURT ERR BY FINDING THE OWNERS BREACHED THE CONTRACT?

The district court held that the Owners breached the contract by refusing to pay for the excavation costs, the windows, and the garage doors. The Owners contend they settled the excavation bill for $30,000 and the district court erred when it determined there had been no settlement of that disagreement. Furthermore, they argue they were never in breach for nonpayment because the $55,000 initial payment caused them to have a credit balance on the contract at all times. They allege the district court erred by failing to recognize and apply that credit balance.

> "The elements of a breach of contract claim are:  (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach. [Citations omitted.]" *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083 (2013).

The Owners appeal only the fourth element—the breach of the contract.

10

"We exercise unlimited review when interpreting and determining the legal effect of contracts. But whether a contract has been breached is a question of fact. A district court's factual findings will not be disturbed on appeal if they are supported by substantial competent evidence. In other words, an appellate court will not reweigh the evidence but will accept the district court's findings so long as there is evidence in the record that reasonably supports the ultimate finding. [Citations omitted.]" *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015).

A.      *The $30,000 "settlement agreement"*

The district court held:

"Defendants claim that there was an enforceable settlement agreement that Defendants could satisfy the excavating costs by paying $30,000.00 directly to RDR, and that they tried to pay $30,000.00 to RDR but Rees refused the payment. In order to form a binding agreement, there must be a meeting of the minds on all the essential elements. . . . An unconditional and positive acceptance is required to form a contract; a conditional acceptance of a settlement offer is but a counteroffer which does not create a contract. . . .

"The evidence demonstrates that there was no meeting of the minds on the terms of a settlement agreement. Plaintiff and Defendants discussed what Rees said he would take to satisfy his invoice. While Rees appeared to agree to the figure of $30,000.00, Defendant's, through Kimball, insisted that they would not pay the money until and unless a written settlement agreement was signed and delivered to them. Prellwitz insisted that no releases would be given until the money was paid. There was no agreement. The fact that Capitol Federal later cut a check to RDR for $30,000.00 does not create or complete any agreement. Thus, Rees' refusal to take the check does not amount to a breach, and it certainly does not amount to a breach by Plaintiff."

The Owners argue the district court erred by considering Rees' actions. They contend the only parties to the settlement agreement were PCI and themselves, and they had a meeting of the minds in that they agreed PCI would accept $30,000 as payment in

11

full, as shown by the revised invoice showing that amount. They insist that whether Rees later refused the payment is irrelevant, as the negotiation was between the Owners and PCI about how much of the excavation costs the Owners would bear. They assert the $30,000 check from CapFed was their attempt to perform under that settlement agreement and PCI breached the agreement by refusing to accept the check.

> "Whether a contract exists depends on the intentions of the parties and is a question of fact. However, when the legally relevant facts are undisputed, the existence and terms of a contract raise questions of law for the court's determination. . . .

> "In order to form a binding contract, there must be a meeting of the minds on all the essential elements. An unconditional and positive acceptance is required to form a contract, a conditional acceptance of a settlement offer is but a counteroffer, which does not create a contract. [Citations omitted.]" *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012).

We find substantial competent evidence supports the district court's finding there was no meeting of the minds between PCI and the Owners settling the excavation bill for $30,000. Rather, the $30,000 was the first counteroffer from PCI, a counteroffer the Owners rejected.

On March 27, the Owners offered $25,000 to settle the excavation bill; that offer was rejected. Two days later, Coe responded by email that "RDR will accept $30,000.00 from you for payment in full on the $44,000.00." This was a counteroffer. On April 10, 2017, Kimball replied by email, noting he received an invoice for $30,000 but requiring "a signed agreement or statement from [Rees] and Prellwitz acknowledging that the $30,000.00 is the agreed upon settlement and that payment of such is the final billing with no payment expected in the future." Kimball continued: "I will not sign the draw request for the $30,000.00 until I have such a signed statement." Kimball's added condition to PCI's offer—a signed release—was a counteroffer, not an acceptance of

PCI's settlement offer. The remaining conversations between the parties, the Owners' ultimate preparation of a check for $30,000, and Rees' refusal to accept it does not operate to somehow revive PCI's initial $30,000 offer that the Owners rejected. See *Lindsey Masonry Co. v. Murray & Sons Construction Co.*, 53 Kan. App. 2d 505, 517, 390 P.3d 56 (2017) ("A conditional acceptance is a counteroffer that rejects the original offer.").

Thus, we find the evidence before the district court reasonably supports the ultimate finding that there was no meeting of the minds and, therefore, no settlement agreement formed by the Owners and PCI. The amount the Owners owed for excavation costs, including the contractor's 15% allowance fee, exceeded $48,000.

### B. *The $55,000 payment*

The Owners contend they did not breach the contract by nonpayment. They argue the initial $55,000 payment should have been credited to their account. According to their calculations and because of the initial payment, they maintained a credit balance at all times.

Paragraph 3 of the contract states: "The Owner shall pay the Contractor for the performance of the Contract, but subject to any additions or deductions provided by the parties, the sum of $529,558.00 which includes allowances, listed in Description of Materials, inclusive of the Contractor's fee."  Paragraph 7 states: "Payments by the Owner to the Contractor shall be due immediately upon receipt of a statement from the Contractor at the completion of the states of construction according to the following schedule:  A. $55,000.00 when Contract is signed by both parties [and] B. Monthly draws as soon as excavation starts." As the district court held and as the Owners acknowledge, there is no contract provision specifying a use for the $55,000, nor does the contract specify the amount of the contractor's fee. The Owners contended they were told it was to

13

be used specifically for windows, but Prellwitz considered it his contractor's fee. Based on our analysis of the purported settlement agreement, we need not resolve whether the trial court erred in the manner in which it resolved this point of disagreement. If the district court had been persuaded by the Owners' factual assertion that the excavation bill was settled for $30,000, then the Owners may have had an argument there was no breach. But even if we accept the Owners' view that the $55,000 payment should have been applied towards the amount due, the Owners were still in breach of the agreement for nonpayment.

While it is true the $55,000 payment, if applied as a credit towards amounts due under the contract, would fully satisfy the excavation bill or the billing for the windows and garage doors, it was not adequate to pay both. The charge for the windows and garage doors amounted to $18,772.23. When added to the $44,044.95 excavation bill, the amount due under the contract when this action was filed exceeded $55,000. Thus, even if the initial $55,000 had been credited against billings, the Owners breached the contract by not paying the balance due.

We find substantial competent evidence supports the district court's determination the Owners breached the contract.

III.   DID THE DISTRICT COURT ERR BY HOLDING THE OWNERS HAD NOT PROVEN THEIR KANSAS CONSUMER PROTECTION ACT CLAIMS?

The district court considered five acts or practices by PCI that the Owners contended violated the KCPA, and it concluded the Owners failed to prove their claims. The Owners argue on appeal the district court erred in rejecting four of those claims:  (1) "Misrepresentations regarding project pricing," which includes representing that contract prices were set by subcontractor bids when PCI had not obtained such bids and Coe's representation that the allowance amounts were realistic and strong; and (2) "Acts

14

relating to the Owners' $55,000.00 advance payment," which includes Coe allegedly telling the Owners that PCI would use the money one way but then using it another way and concealing that use from the Owners. The other two claims alleged unconscionable acts: (3) "Failing to keep the Owners advised of incipient cost overruns during the excavation phase of the project" and (4) "Engaging in false and disparaging communications with the Owners' employers," based on Prellwitz' letters to the Owners' employers.

"The KCPA prohibits both deceptive and unconscionable acts and practices by a supplier in connection with a consumer transaction. . . . The KCPA expressly provides that it is to be construed liberally in order to protect consumers from suppliers who commit deceptive and unconscionable practices." *Via Christi Regional Med. Center, Inc. v. Reed*, 298 Kan. 503, 519, 314 P.3d 852 (2013). Neither party disputes that the KCPA applies to their interactions.

Under the KCPA, deceptive acts and unconscionable acts are distinct, although an act may be both deceptive and unconscionable. K.S.A. 2019 Supp. 50-626 prohibits deceptive acts and practices and sets forth a nonexclusive list of 14 sample violations. "'Whether a deceptive act or practice has occurred under the [KCPA] is not a question of law for the court, but rather a question of fact for the jury to decide.'" 298 Kan. at 520.

On the other hand, K.S.A. 50-627 prohibits unconscionable acts and practices and sets forth a nonexclusive list of seven circumstances for courts to consider when determining whether an act or practice is unconscionable. "[W]hether an action is unconscionable under the KCPA is a legal question for the court . . . . The determination of unconscionability . . . ultimately depends upon the facts in a given case. And, to a great extent, the determination is left to the sound discretion of the trial court." 298 Kan. at 525.

15

The Owners assert generally that "[q]uestions involving KCPA violations are mixed questions of fact and law" and do not further articulate a standard of review. PCI asserts we should determine whether the district court's fact findings are supported by substantial competent evidence and, if so, whether the fact findings sufficiently support the district court's conclusions of law. PCI also contends our review should accept as true all evidence that supports the district court's findings.

But the Kansas Supreme Court has held that a district court's finding that "'the party upon whom the burden of proof is cast did not sustain the requisite burden'" requires a unique standard of review. *Cresto v. Cresto*, 302 Kan. 820, 845, 358 P.3d 831 (2015). Here, the district court explicitly held that the evidence at trial "does not support [the Owners'] claims that [PCI] committed deceptive acts punishable by the KCPA" and "does not support [the Owners'] claims that [PCI] committed unconscionable acts punishable by the KCPA." In this case,

> "'Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice the finding of the trial judge cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed.' [Citation omitted.]" 302 Kan. at 845.

The Owners do not argue the district court arbitrarily disregarded undisputed evidence or that an extrinsic consideration such as bias, passion, or prejudice affected the district court's decision. Rather, they reassert the arguments they made to the district court and ask us to reweigh the evidence. Because the Owners have failed to assert the grounds necessary for us to reverse the district court's finding, they have waived and abandoned the argument. See *Lambert v. Peterson*, 309 Kan. 594, 598, 439 P.3d 317 (2019) ("Because of [the appellant's] failure to brief or assert any of these arguments before us, she has waived or abandoned them.").

16

Nonetheless, we briefly address why the Owners' arguments fail on the merits. First, the Owners do not articulate clearly how the district court erred, instead merely repeating the arguments they made directly to the district court. Second, the Owners' arguments ask us to reweigh evidence or reassess witness credibility on appeal, which we do not do when reviewing for substantial competent evidence. See *Geer v. Eby*, 309 Kan. 182, 191, 432 P.3d 1001 (2019) ("'The appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact.'").

### A. *Alleged deceptive acts*

With respect to the alleged deceptive practices, the Owners first argue Coe knowingly misrepresented that the prices in the contract were keyed to subcontractor bids. But Coe testified at length about his explanations to the Owners that if they wanted more specific numbers in the contract and wanted items listed as bid amounts instead of allowances, the Owners should do the work themselves to determine how much those items would cost. Coe also testified he did not tell Kimball that PCI was obtaining bids on every work item—because it was not PCI's practice to do so, he tried to provide realistic allowance amounts in the contract, and he "[a]bsolutely" did not deliberately use low allowance amounts.

The Owners also argue Coe told them the $55,000 payment "would be used to mobilize the project, to lay utilities to power the project, and to purchase custom windows and doors." But Coe testified he gave the Owners a different explanation for the $55,000—it was the Owners' "skin in the game" to show their commitment to a project for which PCI would start spending money. The district court apparently found Coe more credible, as it held PCI "did not make willful misrepresentations." As we do not reassess witness credibility on appeal, we find substantial competent evidence supports the district court's ruling there were no deceptive acts committed by PCI. See *Geer*, 309 Kan. at 190.

17

B.    *Alleged unconscionable acts*

K.S.A. 50-627(b) provides a list of circumstances which the district court is to consider in determining whether an act or practice is unconscionable. After noting none of those factors apply here, the district court held:

"Defendant are sophisticated consumers who demonstrated themselves well able to protect their interests under the contract. Further, the evidence adduced at trial does not support Defendants' claims that Plaintiff committed unconscionable acts punishable by the KCPA. Plaintiff did not act unconscionably in regard to the excavating invoice. The allowance was reasonable for a typical slab on grade project. There was ample testimony regarding the sloped nature of the property and the difficulty posed by excavating in the middle of a Kansas winter. There is no evidence Plaintiff purposely deceived Defendants about the cost of excavation. The costs simply far exceeded the allowance and there was no evidence of a viable cheaper alternative. This is an unfortunate turn of events on a construction project, but it does not amount to an unconscionable act.

"Finally, Prellwitz' letter to Defendants' employers was a harsh and perhaps unprofessional attempt to collect money owed. Even so, it does not amount to an unconscionable act. Defendants' counterclaim for violation of the KCPA (unconscionable acts) fails."

The Owners again ask us to reweigh the evidence presented and come to a different conclusion than the district court:  that the excavation cost could and should have been avoided had Prellwitz behaved differently and that the Owners did not owe PCI money, so the letters to the Owners' employers were unconscionable. But, again, we do not reweigh evidence, and the record contains ample evidence to support the district court's factual findings and legal conclusions.

Affirmed.

18